# John Robson,

*vs.*

## James Jones, Administrator of Michael Robson, Deceased.

*New Castle, Sept., T. 1866.*

M. R., the obligee in two bonds of his son I. R., made and signed on them these indorsements :—on one of them the words, "I satsy all my Frinds of this bond ; it is a free gift. of Michael Robson at my decease ; " on the other, "I satsy all my frinds of this bond ; it is a free gift at my decease." M. R. being in old age and infirm health delivered the bonds with other bonds into the possession of a daughter, but without any direction as to the disposal of them, and they so remained until after his death. *Held,*

1. That this was not a gift of the bonds to I. R. *inter vivos* ; the benefit intended being testamentary ; also there not being a sufficient delivery of the bonds.

2. That it was not a gift *causa mortis ;* it not being made "in peril of death" ; also there not being a sufficient delivery.

*It seems*, upon the weight of authority to support a gift *causa mortis* it must be made *under the apprehension of death as imminent,or in extremis.* It is not sufficient that death be contemplated as a result of the sickness, which may probably occur at some indefinite time afterwards.

The *delivery* necessary to support a gift *causa mortis* must be an actual, unequivocal and complete tradition of the thing given or of that which carries the control of it, divesting the donor of all future control of it—such a delivery as would make the transaction a gift *inter vivos*, if that were in contemplation of the donor.

3. That the transaction was not *an* equitable release, the benefit intended for I. R. being testamentary ; also he being a *volunteer.*

A Court of Equity will not aid the defective execution of a will.

A Court of Equity will enforce a defective assignment or release only in favor of one who has paid a valuable consideration. A *meritorious* consideration is not sufficient.

Distinction between a defective voluntary assignment or release, such as a Court of Equity will not enforce, and some act or declaration of the donor constituting himself a trustee and vesting an interest by way of a trust.

Distinction between a defective voluntary assignment or release and a gift *causa mortis* of a *chose* in action, which, though not passing at law by delivery only, entitles the donee in equity to an assignment.

A defective voluntary gift or conveyance, not enforceable against the donor in his lifetime, will not be enforced in equity against his representatives.

A Court of Equity will not hold as discharged a debt due to a decedent, on the mere ground of his intention not to enforce it, or of his treating it as not obligatory. The cases of *Wicket vs. Raby, 2 Bro. Parl. Cas. 386; Eden vs. Smith, 5 Ves. Jr. 341; Flower vs. Martin, 2 Myl. and Cr. 459;* and *Aston vs. Pye, 5 Ves. Jr. 354,* examined.

INJUNCTION BILL TO RESTRAIN THE COLLECTION OF TWO BONDS.—Michael Robson in his lifetime, held two judgment bonds of his son John Robson, one for $1000, the other for $500. After Michael Robson's decease, these bonds came to the possession of the defendant as his administrator, who proceeded to collect them. This bill was filed by John Robson to restrain the collection of the bonds, the complainant claiming to be discharged from their payment by certain acts of Michael Robson in his lifetime.

The bonds bore the following indorsements made and signed by Michael Robson:—On the bond for $1000, "I "satsy all my frinds of this bond. it is a free gift of "Michael Robson at my decease:" On the $500 bond, "thus, "I satsy all my frinds of this bond : it is a free "gift at my decease."

The bill alleged that Michael Robson had, in his lifetime, made a sufficient delivery of these bonds to a third person (Hannah E. Surgen), for John Robson, to raise a gift *inter vivos,* as to the principal, though reserving the interest during his lifetime ; that such delivery, if not sufficient as a gift *inter vivos,* operated as *donatio causa mortis,* having been made by Robson in his last sickness and in contemplation of death ; other grounds of equitable relief were also relied upon, supposing the proof not

sufficient to establish a gift either *inter vivos* or *causa mortis*. The answer denied the whole equity of the bill.

The testimony mainly relied on to prove a delivery was that of Mrs. Surgen, a daughter of Robson. She stated that Michael Robson handed her these bonds, together with a bond of Nathaniel Riggs and one of Edward Beck, also a $10 gold piece and a silver dollar and a quarter that had belonged to her mother. No conversation *leading* to this act was proved. All that was said by him at and following the transaction was thus stated by Mrs. Surgen : "he told me to take those bonds "home and keep them ; he wished brother John to be his "administrator, and that his, (Michael's,) wife could not do "anything with them :" * * * "this was all he said, for he walked right out." In answer to a more direct inquiry the witness replied : "he did not say, at that time, that "the bonds were intended as a gift to his son at his death ;" * * * "he did not tell me to give them, either "before or after his death to John Robson as a gift, or for "any other purpose ; nor did he give me any directions as "to the said bonds that did not apply to the other bonds "which were placed in my possession." Other witnesses stated that at the time of the delivery of the bonds he said that in case of his death they would have to be taken to Dover and settled. Some time after this transaction Robson took back from Mrs. Surgen the spectacle case ; but all the bonds and the coin remained with her until his death and were afterwards delivered to the administrator. It appeared in evidence that on two prior occasions, Michael Robson had given his paper in the charge of different persons, and subsequently withdrawn them.

The transaction with Mrs. Surgen was shewn to have occurred on January 1865. At that time, according to the facts, Michael Robson was an old man and in declining health ; but was not then confined to his house. He was walking about when he delivered the bonds to Mrs. Surgen, and within a week afterwards walked to Kenton, one

mile distant, and to Mrs. Surgen's house, two miles distant. He finally took to his bed about the middle of February and died the 6th of April 1865. Some proof was adduced, by the defendant, to shew that the intention in favor of John, expressed by the indorsements on the bonds, did not continue until his death. An informal will was produced, dated a few weeks after the indorsements were made, in which there was no mention of John or of the indorsements, but his estate was disposed of equally among his children, subject to a provision for his widow. Also an account with John, for the interest, was kept until a short time before Michael Robson's death. There was also testimony that shortly before his death he had said that John's father-in-law being dead John would get a considerable sum from his estate and would be able to pay these bonds, and he should expect him to do so.

*G. B. Rodney*, for the Complainant.

1. The delivery of these bonds to Mrs. Surgen, coupled with the indorsements, as evidencing the purpose of it, operated as a gift *inter vivos* or immediate discharge of the principal. We admit that to such a gift a delivery, irrevocable, is essential. But the delivery may be to a third person for the donee ; and it may take present effect to pass property in the things given though to be enjoyed in the future. The effect of the transaction depends solely upon the intention of the donor ; and this as in the case of a *donatio causa mortis* may be evidenced, not by words only, but by any circumstances  In this case the purpose of the delivery to Mrs. Surgen is evidenced by the indorsements, which plainly shew an intention to give John the principal, reserving only the interest during his, the donor's, lifetime. There is no legal objection to such a reservation. An owner of property may in his lifetime dispose of it by gift to take effect at his death. in all respects as he may by will ; the only difference being that the one mode of disposal is revocable, the other is not.

2.   If the Court considers that there was not a suffi-
cient delivery of the bonds to Mrs. Surgen to support a
gift *inter vivos*, we then insist upon it as a gift *causa
mortis*.   Such a gift may be by delivery to a third per-
son.   2 *Bro. Ch. R.* 612, and cases cited ; *Wells vs. Tucker*,
3 *Binn.* 366.   No words of gift are essential.   The question
is one of intention, and this may appear as well by acts
as words, or may be implied from all the circumstances.
In this case the indorsements on the bonds demonstrate
the purpose of their delivery to Mrs. Surgen, that the de-
livery was to her for John's benefit, as a gift of the principal,
to take effect upon the donor's death.   The sole question
then is whether Michael Robson was at the time of the
delivery in such a condition as to make the gift effectual
as a *donatio causa mortis*.   We admit that he must have
been in what is termed "peril of death."   But this does not
mean *immediate* death, that he was in *in extremis* or dying ;
but it means only that he was in his last sickness, appre-
hending that he would not recover and that he did not
recover.   1 *Sto. Eq. Jur. Sec.* 606 ;   2 *Kent Com.* 444 ;
*Redfield on Wills, Pt. II.* 296 ; *Hill vs. Chapman*, 2 *Bro. Ch.
R.* 612 ; *Lawson vs. Lawson*, 1 *P. Wms.* 441.   The question
whether the donor was in peril of death rests much on his
own apprehension ; for it concerns his intention, which
depends upon his own judgment of his condition.   In
this case Robson was unquestionably under his last sick-
ness ; and the conversation as to what would be done
with the bonds, after his death, shewed that it was the
apprehension of death which prompted him.   Though his
sickness was protracted and his condition fluctuating he
never in fact recovered, nor does he appear to have become
able to revoke the gift.   These circumstances satisfy the
reasonable requirements of the rule.

3.   The delivery of these bonds to Mrs. Surgen for
John Robson operated as an equitable release of the
principal.   Such was unquestionably Michael Robson's in-

tention, as evidenced by the indorsement on the bonds ;
and equity will give effect to the intention.   A release
though not formally executed at law, may be valid in
equity.   Any thing in writing, shewing that an obligation
is *functus officio*, even without a delivery of it, is sufficient ;
and such, with respect to the principal, was the clear
purport of the indorsement on these bonds.   Again, de-
livery alone, of a *chose* in action, with a view to pass an
interest, may operate in equity as an assignment or as a
release.  *Thigpen vs. Harne.* 1 *Ired. Eq. R.* 20.  Here there
was a delivery of the bonds and written evidence under
the hand of the obligor, of the purpose to release the
principal.   There was also a consideration.   It was a pro-
vision for a poor son, who had rendered service so far
unremunerated, and for whom the father had done less
than for his other children.  This presents a consideration,
partly valuable and partly meritorious.   A provision for
a child is a sufficient consideration to support such a gift
or release. *Coleman vs. Sarrell,* 3 *Bro. Ch. Rep.* 13 ; *Dil-
lon vs. Coppin,* 4 *Myl. &* 1 *Cr., x* 647.   Even considering
the release as voluntary, and revocable, yet, if the party
has not, in his life time, exercised his right of revocation,
equity will enforce it as against his executor, in considera-
tion of his intention.  1 *Sto. Eq. Jur. Sec.* 433.

4. This case falls within the principle of a class of
cases in which obligations, treated by a creditor in his
life time as *functus officio,* and not intended to be enforced,
have been, after his death, held by a court of equity to be
discharged, in order to carry into effect the intention on
which the party has himself acted.   In such cases, the
release of the obligation, though voluntary and revocable,
if not revoked, in the lifetime of the party, has been after
his death enforced against the executor though not
against the heir. 1 *Sto. Eq. Jur. Sec.* 433, 705 ; *Aston vs.
Pye,* 5 *Ves. Jr.,* 350, 354 ; *Eden vs. Smith, Ib.* 341 ;
*Flower vs. Martin,* 2 *Myl. & Cr.* 459 *(*14 *Eng. Ch. R.) ;*

*Wickett vs. Raby,* 3 *Parl. Cas.* 16, 2 *Brown, by Tomlin,* 386. In all these cases the intention to treat the debt as released was gathered from various sources. Here, it rests upon the clearer evidence of the written indorsement. And against this, parol testimony is inadmissible. The indorsement not being stricken off must be taken as evidence of a continuing intention. The weight of the testimony, however, is against any change of the purpose of these indorsements.

*Comegys* and *Spruance,* for the defendant.

1. The argument to support a gift *inter vivos* must fail from the want of a delivery. A gift is a voluntary disposition of personal property, to take effect immediately for the benefit of the donee; 2 *Kent Com.* (438.) Actual delivery is essential; a constructive one is not sufficient. It is completed by a transfer of possession and goes into effect at once. *Parsons on Cont.* 234. Further there must be an acceptance. A gift may be so made as to inure to the future benefit of the donee, retaining a present interest in the donor; but that must be by a delivery to a third person in trust, clear of all future control of the donor, and of all interest in him other than such as he may take under the trust. The test of a gift is the question whether any dominion or control is retained. *Irons vs. Smallpiece,* 2 *B. & Ald.* 551; *Noble vs. Smith,* 2 *Johns.* 52; *Farmer vs. West,* 12 *Johns.* 186.

2. Was there a *donatio causa mortis?* To that there are two requisites: *First,* a delivery. This must be actual, and such as to divest the donor of all future control of the subject of the gift. No present intention to give, however absolute and positively declared, is sufficient, without an actual delivery. 1 *Sto. Eq. Jur.* § 607 *a,* 608; 1 *Williams on Exrs.* \* 651; *Redfield on Wills, Pt. II,* 296; *Bunn vs. Markham,* 7 *Taunt* 224; *Reddel vs. D'Aubree,* 10 *Simons* 244 (16 *Eng. Ch. R.*) The last case

shews the strength of the rule as to what is a delivery.
There the donor put into plaintiff's possession a box con-
taining money and declared that the plaintiff should have
it at the donor's death ; but he kept the key and occasion-
ally opened the box.   Held not a sufficient delivery to
support a gift *causa mortis*.   The present case is far
weaker.    The bonds in question were handed to Mrs.
Surgen, together with others, without any declaration of
purpose, other than for safe keeping.   The same thing
had been done in two prior instances.   It was a deposit
—not a delivery. The direction to Mrs. Surgen was, "take
the bonds and *keep* them" not deliver or hold them for
John.    She was Michael Robson's custodian, and the
bonds subject to his continuing control.   The other re-
quisite to a *donatio causa mortis* is that it must be made
"in peril of death"; that is, under a present apprehension
of death, which must ensue without any remission of the
apprehended peril.    *Redfield on Wills*, Pt. II, 296 ; 1 *Sto.
Eq. Jur. sec.* 607 *a* ;   1 *Wms. on Exrs.* * 651 ;   *Tate vs.
Hilbert*, 4 *Bro. Ch. R.* 286 ; *Edwards vs. Jones.* 7 *Simons*
325.   Here there is no pretense of a *donatio causa mortis*,
except upon the delivery of the bonds to Mrs. Surgen ;
and then Robson, though an old man and declining, was
in his usual health, able to go about and did not die for
over a month afterwards. .

3. A release of a *chose* in action at law may be either
by delivery or by a written instrument ;   but, in either
mode, it must have been intended to operate presently
and without anything remaining to be done to give it
effect.   If anything remain to be done it may be an agree-
ment to release but not a release.   A defect in an intended
execution of a release will be supplied in equity only
where there is a consideration for it ; and although for-
merly a meritorious consideration was held sufficient, that
doctrine has been overruled, and the modern cases hold a
valuable consideration to be essential.   Equity will not,

in favor of a volunteer, supply any defect in the execution of a purpose to release. 1 *Sto. Eq. Jur.* 433, 793 *b; Dillon vs. Coppin,* 4 *Myl. & Cr.* 647 ; *Tufnell vs. Constable,* 8 *Sim.* 69 ; *Edwards vs. Jones,* 7 *Sim.* 325, 1 *Myl. & Cr.* 226.

The argument to support this transaction as an equitable release fails for the want, either of a delivery, or of any writing, intended to operate as a present release. The indorsements on the bonds relied upon were intended to operate only at Robson's death. They might, if duly attested under the statute, have been good as a will. But in no case can a defective attestation of a will be supplied ; nor can a paper, which, if attested would have been a will, be held, if unattested to operate as a gift or release.

4. This case is not within the principle of those decisions in which obligations though not formally released, surrendered or cancelled have been held *functus officio* and inoperative—such decisions are few and rest upon very special circumstances, and in all, an essential feature was that the obligations were created and held for some special purpose which being fulfilled they were afterwards treated by the obligor as presently inoperative. They are not cases of an intention to release not carried into effect. Such were *Eden vs. Smith,* 5 *Ves.* 341. *Aston vs. Pye, Ib.* 354 ; *Flower vs. Martin,* 2 *Myl. & Cr.* 459 ; *Wickett vs. Raby,* 3 *Brown's Parl. Cas.* 16, 2 *Bro. P. C. by Tomlin* 386.

THE CHANCELLOR :—

The complainant, John Robson, was indebted to his father, Michael Robson in two judgment bonds, one dated March 25, 1856, for $1000. and the other dated April 30, 1857, for $500. After the father's death these bonds came into the possession of his administrator, the defendant, who caused judgments to be entered and executions to be issued. This bill is filed to restrain the collection

of the judgments, the complainant claiming to be discharged from the payment of these bonds in consequence of certain acts of Michael Robson set forth in the bill, and in respect to which he claims the benefit of some one of four distinct grounds of equitable relief. I will consider them in order.

I. It is insisted that there was a gift *inter vivos* of the principal of these bonds to John Robson. To this position there are two fatal objections :

1st. The benefit which Michael Robson intended for John was testamentary. In each indorsement the "gift" so called, is declared to take effect " at my death" not before ; and this as to all that the gift embraces,—that is, the bonds, the whole, both principal and interest, not the former as contra-distinguished from the latter. There is nothing in these indorsements which, by the most strained construction can, in the donor's lifetime, carry to John, Robson any benefit, or take from the donor any right, in these bonds or control over them i. e. to collect the whole, principal and interest, or to make any disposal of them whatever. So clear is this construction that had either of these indorsements been signed and attested, according to the statute of wills, it would have been valid as a testamentary disposition of the debt. Nor can there be the least doubt as to Michael Robson's power, at pleasure, to strike off these indorsements and revoke whatever effect could be ascribed to them, I mean so long as the bonds themselves should remain under his control, uncancelled or unsurrendered. Now, if a discharge of John Robson at his death, directed by a will executed with all legal solemnity, would have been revocable, how much more so, an indorsement of such a nature that it may well be denominated an informal will. Indeed, the real and only difference between the two is that the indorsements need no revocation, as would a will, to defeat their effect ; for, taken alone, they have no legal operation, being the mere

expression of a wish or intention not carried into execution by the appropriate legal forms.

In thus construing these indorsements upon their face we are relieved from any apprehension that Michael Robson's inartificial language may have failed to express all that he meant. For the frequent declarations he made of his purpose respecting these bonds shew that he intended John Robson to be discharged from the bonds only at his (Michael's) death, and that meantime they were to remain in full force and subject to his absolute control. In all his conversations on the subject his language is such as this. To Mrs. Senior he said "the money John owes' (this means the principal) "is a free gift to him *at my decease;*" "the bonds are to be given up at my death." To Wm. Surgen he said with a difference of mere phraseology, that "he would have them fixed so that they could not be collected *after his death.*" And in similar style were his declarations to David Senior, Mary Bennett, John P. Hudson and Hannah Surgen. With respect to the condition of the bonds *in his lifetime,* no expressions by him indicate that John was to take any benefit or that the force and effect of the bonds or his own control over them were to be at all impaired. On the contrary, after the indorsements were made and while he no doubt considered them as giving legal effect to his wishes he held John bound for the interest, collected it in part and charged him with the unpaid interest in an account kept up to Sept. 1864; and on this very ground, that is the necessity of keeping the bonds in force in order to secure him the interest, he declined the suggestion of friends that he should surrender or destroy them; a suggestion made once by Wm. W. Nelson and at another time by Mrs. Surgen. His notion was in accordance with the legal effect of any present discharge of the principal; for this would necessarily discharge the interest. The interest is but an incident or consequence of the obligation to pay the principal and must stand or fall with it. Again, to several

witnesses, and to one standing in no relation to be biased, John Hall, he expressed his purpose to hold John to pay the bonds, meaning principal and interest ; and according to James B. Riggs' testimony he at one time meditated striking off the indorsements.

I cannot then accept Mr. Rodney's proposition that the gift, intended in these indorsements, and insisted to have been effectuated by delivery of the bonds to Mrs. Surgen, was an *immediate discharge* of the principal, operating, that far, *inter vivos*, with a reservation of the interest during his lifetime. On the contrary, his intention was to hold both principal and interest in force during his lifetime : indeed, their separation would have been legally impracticable. If this view of the testamentary nature of the benefit intended for John Robson is correct, then, it cannot be the subject of a gift *inter vivos*. The two things are incompatible ; the one being intended to operate after the donor's death and subject in the meantime to his control and revocation ; the other, as its name imports, "gift *inter vivos*," being a gift to operate, if at all, in the donor's lifetime, immediately and irrevocably. It is a gift executed. No further act of parties, no contingency of death or otherwise, is needed to give it effect. Says Kent, 2 *Comm.* 354 ; "Gifts *inter vivos* have no reference to the future and go into immediate and absolute effect." It is true, as the complainant's counsel suggested, that under a gift *inter vivos* a party may take a benefit to accrue *at a future day*—it may be at the donor's death. But this can be only through the instrumentality of a trust created either in a third person or in the donor. The effect of creating the trust is to divest at once the former property of the donor in the thing so given. Such a gift is no less immediate than in the ordinary case. No such trust was created with respect to these bonds.

2d. In this view of the case it becomes unnecessary—perhaps inappropriate—to consider under this head the question of the delivery of these bonds to Mrs. Surgen.

For if there were a delivery sufficient to operate as a gift of any sort it would be only as a gift *causa mortis.*

II. Was there then a gift *causa mortis?*

A gift *causa mortis* has some properties in common with gifts *inter vivos* and some in common with legacies ; but in its essential properties it is *testamentary* ; being made in consideration of the donor's death ; and being in the meantime revocable. It is in fact one of the exceptions (nuncupative wills being the other) to the policy of the statute of wills, which requires dispositions of property intended to take effect after death to be made in writing, signed by the party making them, and attested by two witnesses,—an exception originally allowed as a concession to those who through sickness or some impending danger were disabled from making a formal will. Hence, the validity of such a gift is subject to these conditions. 1st. It must be made "in peril of death." 2d. To guard against fraud and supply an equivalent to the written evidence of intention, an *actual delivery* of the property is required. 3d. Upon the recovery of the donor and his consequent ability to comply with the statute, the dispensation from its requirements ceases and the gift *causa mortis* though valid when made becomes of no further force. No express condition to this effect is necessary.

The case before us presents two questions which were thoroughly and ably argued.

1. Was Michael Robson in "peril of death" at the time of the supposed gift *causa mortis?*

I have labored to obtain from the authorities a clear view of what is implied in these terms, "peril of death"— in other words, what is that precise condition of disability in consideration of which it is that the law gives effect to a gift *causa mortis.* Thus much is certain, that the gift to be valid in the first instance must be made under apprehension of death, as likely to result from some present peril, usually that of sickness. It is further certain that

to render the gift finally effectual death must in fact ensue from the sickness or other peril under which it was made. But on another question I am unable to derive from the text books and decisions any settled conclusion : That question is, whether the apprehension of death must be an apprehension of death as *presently imminent*, the donor being, as it is said *in extremis* ; or, whether it is sufficient for the validity of the gift if death be contemplated as the probable result of the sickness, a result likely or even certainly to occur but after an indefinite interval—it may be of weeks or months ; as in the case of chronic diseases generally.

One would naturally suppose that as this class of gifts was introduced into the common law manifestly as an exception to the policy of the statute of wills—a policy deemed of great importance as the cautious provisions respecting nuncupative wills shew—it would have been from the beginning confined to cases of actual disability, or at least of embarrassment, on the part of the donor, caused by a sense of the presence or near approach of dissolution,—a condition in which a compliance with the formalities of the statute could not reasonably be required. It is altogether probable that originally gifts *causa mortis* were allowed to be made only, by persons *in extremis.* In the first reported case of a gift *causa mortis, Hedges vs. Hedges, Prec. in Cha.* 269, Lord Ch. Cowper, a learned and accurate judge, defines a gift *causa mortis* to be "where a man lies *in extremis,* or being surprised with sickness and not having an opportunity of making his will, but lest he should die before he could made it, he gives with his own hand his goods to his friends about him. This, if he dies, shall operate as a legacy, but if he recovers then does the property thereof revert to him ? This decision in 1708, announced a rule clear and easily applied; but the whole course of decisions since has had the effect to obscure it ; and it is impossible to derive from them any certain rule on the subject. Cases have occurred of gifts

*causa mortis* enforced where at the time of making the gift death was not impending and did not in fact ensue until after an interval of weeks and even months; and in other cases where other objections to the gift have prevailed, the gift has not been held invalid on this ground. The truth is that the natural desire to fulfill the wishes of deceased persons, especially in favor of what are often meritorious claims, has kept the rule always under a strain, which has caused the present uncertainty.

The question is uncontrolled by any decisions known to me in our own Courts; and as between the English cases I confess a strong preference for the narrower construction of these terms "peril of death," the one which seems to have been at first held. It is consistent with the original object of admitting these gifts into the English laws; it guards the policy of the statute of wills; and prevents frauds and uncertainties of title. It is worthy of remark that the two most eminent of English Equity Judges, Lord Hardwicke in *Ward vs. Turner*, 2 *Ves. Sr.* 437; and Lord Eldon in *Duffield vs. Elwees*, 1 *Bligh* 533, have expressed, as the result of their judicial experience, strong regret that gifts *causa mortis* had not been wholly abolished.

The views here expressed are founded upon the consideration that gifts *causa mortis* are testamentary in their nature and should be dealt with as exceptions to the policy of the statute of wills. Judge Gibson, in *Nicholas vs. Adams*, 2 *Wharton* 17, holds to the contrary, that these "gifts are not testamentary but, as he describes them, "are gifts executed in the first instance by delivery of the "thing, though defeasible by reclamation, the contingency "of survivorship or deliverance from the peril." He treats a gift *causa mortis* as but a *conditional* gift *inter vivos*, and not as being testamentary in its nature nor within the policy of the statute of wills; and hence he naturally attaches the less importance to the donor's condition of peril as one of the pre-requisites to a gift *causa mortis.*

9

But that able Judge (and this is said with great deference) seems to have been misled by a consideration of gifts *causa mortis* under the civil law. Under that law these gifts formed quite an expanded system. They embraced all cases of gifts made in consideration of mortality, *whether made in present danger or not.* There were three classes of such gifts, one of which classes is described to be " a donation " made by one in no present danger but in consideration " of mortality if he died." Lord Hardwicke in *Ward vs. Turner* 2 *Ves. Sr.* 439, states these several classes and their incidents , and from him we learn, what indeed is manifest from the whole course of the English cases, that the entire system of gifts *causa mortis*, under the civil law, was not adopted in England, but only that class of them in which the gift is made in contemplation of death *as a present danger* ; and *gifts* of this class have always been held to be testamentary or of the nature of legacies, under both the civil and the common law. They have nothing in common with gifts *inter vivos* except that delivery is essential ; but this feature concerns the mode of their creation rather than their essential properties when created. Like legacies they are ambulatory and take effect only at death ; they are revocable at pleasure, and, as a will, they are subject to the debts of the decedent ; are subject in England to legacy duties, and in this country a gift *causa mortis* has been held to be revoked by the subsequent birth of a child, where by law such an event would work the revocation of a will. See this subject learnedly treated in *Bloomer vs. Bloomer*, 2 *Bradford's Surrogate Rep.* 346-7.

This presents to the counsel the exact result of an examination of the question what is the legal sense of the terms "peril of death," as expressing the donor's condition at the time of the gift—whether to sustain the gift it must appear that he was, when making it *in extremis.* Though with a strong inclination in favor of such a conclusion, yet not finding any rule satisfactorily settled, I leave the

question as an open one ; and will proceed to consider whether, upon the evidence, Michael Robson at the time of the alleged gift, was "in peril of death" in any sense which those terms will bear, either as being *in extremis*, or only in a last sickness, likely to result and which did result in his death.

The inquiry goes to the time of the transaction with Mrs. Surgen. This she states occured in the latter part of the fall of 1864. In this an examination of the whole testimony shews she is mistaken ; it was in the middle or latter part of January 1865. She further states that when he handed her these bonds "he was in usual health ;" "it was," she said, " not during his last sickness" ; by this I do not understand her to mean that he was in good health, but only that he had not taken to his bed with the last sickness. Other witnesses describing his condition from the middle of January to the middle of February, at which last date he took to bed, say that he was "poorly," that his health was bad,"that he "had the chills, sometimes feeling pretty well, at others quite sick." Speaking particularly with reference to the conversation with Mrs. Surgen and his handing her the bonds, the witnesses all agree that he was not then confined to his bed ; that a few minutes after the transaction he walked out into the yard. It is also proved that a short time after this he walked to Kenton, one mile distant, also to Wm. Surgen's, two miles distant. The whole testimony fixes the time of his first confinement to bed as the middle of February, and he died early in April.

After carefully weighing all the circumstances I am unable to say that at the time of the conversation with Mrs. Surgen, Michael Robson was in his *last sickness*, or laboring under an existing disorder then threatening and which terminated in his death. Undoubtedly there had set in a decay of his natural powers, which rendered him less able to resist the effect of exposure, and there was a connection between this and the sickness of which he

died ; but what may be properly termed the last sickness had not commenced.  At least the fact does not appear clear enough to rest a decision upon if the case depended upon this point.  Now, unless Michael Robson was in his last sickness at the time of his conversation with Mrs. Surgen he could not then make a valid gift *causa mortis* even under the largest application of the terms "peril of death" which allows such a gift to be made under an apprehension of death as the ultimate result of an existing disease, even though not contemplated as imminent or very near.  But looking to the narrower application of of these terms, as implying that death is imminent or very near, it is clear that such was not the condition of Michael Robson ; there was nothing in the state of his health to betoken the near approach of death, nor does he appear, from anything said, to have apprehended it as then impending.  He says to Mrs. Surgen about the bonds, "keep "them," "he wished brother John to be his administrator." He *did* contemplate the close of his life as approaching in view of his age and general infirmities ; and these arrangements he was making in view of this, but they were only such arrangements as are natural and proper in all cases of advanced age and do not imply any sense of urgency at the time.  His expression "keep them" implies the contrary.

And such, it may be added, was the spirit of his remarks to Mrs. Senior, when speaking of his affairs, he said to her: "Ann, I am going to die, let there be no quarreling ; the few things that I have shall be equally divided amongst you all, &c."  Further, as to the actual condition of his health there was certainly nothing in it to disable him from making a testamentary disposition of his property according to the statute.  Were I to rest my conclusion on this subject upon the narrower sense of the terms "perils of death," I should say, beyond all doubt, that Michael Robson was not in the condition contemplated by them ; and, on the other hand, applying these words in their largest sense, as raising only the question

whether he was in his last sickness, I should still be obliged to say, without pronouncing positively on the point, that even this is not sufficiently established to sustain a gift *causa mortis* at that time.

We may now take up the other question material in considering whether there was a gift *causa mortis* of these bonds. Was there a *sufficient delivery of them to Mrs. Surgen for John's use?*

Before the great case of *Ward vs. Turner 2 Ves. Sr.* 443, the question of delivery, whether it was necessary at all, and if so how to be made, rested in uncertainty. This resulted from the fact that under the Civil Law, from which these gifts were taken, there were several distinct classes of gifts *causa mortis,* to some of which delivery was essential, to others not so ; and, prior to the case referred to, it had not been clearly determined how far and under what limitation these gifts were adopted into the common law of England. Lord Hardwicke, in an elaborate and historically interesting opinion, defines the very limited extent to which the English law had borrowed from the civil law system of gifts *causa mortis,* taking, as it did, only one out of the three classes which were recognized by the civil law ; and he shows that, to the class adopted, delivery in the donor's lifetime was essential under the civil law, and that, with much more reason, it should be required under the common law in order to protect the policy of the Statute of Wills. He decided in that case that, in England, delivery was in all cases essential ; that the delivery must not be merely symbolical but by actual tradition of the thing itself, or of that which gives control of it, as the key of a chest or warehouse, holding that a delivery of receipts for money paid for South Sea annuities was not sufficient without an actual transfer of the annuities in the appropriate legal mode. These two points were never afterwards controverted ; but there remained to be settled another question entering into the subject of delivery, which was afterwards much discussed in a series of leading cases ;

that is, how far a sufficient delivery is consistent with any future control of the donor over the subject of the gift ; whether the mere appropriation of a thing by the donor in his last sickness, expressly made for the benefit of the donee, its being separated from his other goods and designated for the purpose of the gift, though leaving in the donor a general control, or a control for any purpose, is sufficient, or whether the delivery must wholly remove the thing out of the donor's possession and control.

The latter is the established doctrine. The leading cases are *Bunn vs. Markham, 7 Faunt* 231 : *Hawkins vs. Blewitt 2, Esp.* 663 : *Reddell vs. Dobree* 10 *Sim.* 245 *and Farquahrson vs. Cave*, 2 *Collyer*, 356. To two of these cases it is worth while to refer, that we may observe the rigor of the rule as settled by them. In *Bunn vs. Markham* the decedent took from a chest certain India bonds and bank notes, sealed them up in two parcels, wrote on the parcels the name of the intended donees, charged his natural son to deliver them to the parties after his death, and then put them back into the chest. A few days after he delivered the keys to one of the parties, a woman who lived with him as his wife, charging her to keep them and telling her that the contents of the chest were to be her's and her daughter's, and many times afterwards he declared that the contents were for these parties ; yet *he did not part with the iron chest nor with the control of the keys*; and on that ground the Court held that there was no sufficient delivery.

One of the other cases cited, *Reddell vs. Dobree*, is even stronger. There the decedent delivered to the plaintiff a locked cash box and told her to go at his death to his son for the key, that the box contained money for herself and entirely at her disposal after he was gone, but that he should want it every three months whilst he lived. The box was twice brought to the decedent at his desire and he redelivered it to the plaintiff and it was in her possession at his death. Attached to the key was a piece of bone with the plaintiff's name engraved upon it, and in

the box was found a £500 check payable to the decedent or bearer enclosed in a cover indorsed with plaintiff's name.   Here was a separation of the thing from his other property, a special designation of it to the end contemplated, even a delivery of the box containing it into the plaintiff's custody ;—yet all was held by Sir L. Shadwell, V. C., ineffectual as a delivery to support a gift *causa mortis*, because " *the key was retained and the box required to be brought to him every three months,*" so that he still retained a control over the gift.

This language of the Vice Chancellor of course means control over the box, the possession of it—a control over the *gift*, in one sense, the donor of a gift *causa mortis* in all cases retains, that is, the power to revoke it.

The severity of the doctrine of · these cases is not without a sound reason.   A gift *causa mortis* being a parol gift a delivery of the subject of the gift stands as an equivalent for the written testament required by the statute of wills in order to guard testamentary dispositions of property.   To be such the delivery must amount to an actual, unequivocal, complete tradition of the thing, wholly divesting the donor's previous possession and control of it. In short, it must be such a delivery as would make the transaction a gift *inter vivos* if that was in the contemplation of the donor.   Such is the scope of Lord Hardwicke's reasoning in *Ward vs. Turner*.   The principles settled in that case, have governed the subsequent course of decisions.

Let us now apply the rule established by the cases on this question of delivery.   Suppose we concede to the transaction between Michael Robson and Mrs. Surgen, on which it is that the whole question of delivery rests, the utmost effect in favor of John that can be claimed, viz ; that Michael Robson's purpose in it was that Mrs. Surgen should hold the bonds till his death and then, pursuant to the indorsements, deliver them to John.   More than this

cannot be insisted on, because Michael Robson said nothing at the time to explain his purpose. Complainant's counsel only claims to interpret the transaction by the indorsements ; and there is nothing in the indorsements which contemplates a delivery *before his death ;* "it is a "free gift *at my death.*" In this view then his handing the bonds to Mrs. Surgen could at best only be an appropriation of them and placing them in a safe custody for delivery at his death leaving him in full control of them in his lifetime. Even thus considered the case would fall short of the rule established by all the decisions cited, and in its circumstances would be weaker than some of them, in which, as we have seen, the thing given was set apart from the donor's other property, and even as in *Reddell vs. Dobree* put into the actual possession of the claimant, but with a retained control on the part of the decedent.

But to decide this question of delivery upon what in point of fact is the true ground, it must be said that, in the transaction with Mrs. Surgen, Michael Robson had no reference whatever to the indorsements on the bonds ; that the bonds were handed to Mrs. Surgen not with any purpose of their being held by her for John's use ; that in short the transaction was not in any sense a delivery of the bonds, but a mere deposit of them with her, as her father's custodian, for safe keeping and subject to his own exclusive control and dominion, with no other legal effect than would have attended a change from one chest to another or a deposit with a banker.

III. We next consider the third ground of equity insisted upon, which is, that the transactions inquired about are such as a court of equity may give effect as an equitable assignment or release.

A striking feature of this case, which renders inapplicable the doctrine of equitable aid to imperfect assignment or releases, is the testamentary character of the benefit intended for John Robson. In order to effectuate

Michael Robson's real purpose, the Court must supply a defective attempt, not to assign or release these bonds, but to make a testamentary disposal of them—in short to make a will.    As before concluded there was no delivery of these bonds, to John Robson, or to Mrs. Surgen for him. There remains, then, no act of Michael Robson done or attempted to this end, except the indorsements on the bonds, and it is to these alone that any aid of equity could be invoked.    Let us then consider these.    The first material question is what did Michael Robson intend by these indorsements?    It may confidently be answered that he did not intend to make either  an  assignment or a release of them, operating as a present discharge of the debt.    This was farthest from his purpose.    What he did mean, as has been before fully considered, was that the bonds should be discharged *at his death, remaining during his life in full force, and the indorsements revocable.*    He intended what was in fact and substance, though he may have had no legal ideas about it, a testamentary disposal of the debt secured by these bonds ; according, then, to his  intention, effect  could  be  given  to  either  of these indorsements  only  as  a  will.    Now  equity  can aid an imperfect act or instrument only in accordance with the intention of the party.    It, therefore, cannot give effect to these indorsements as a gift, assignment or release, but only as a will.    This brings us to what is a decisive question  under this ground of equity, and that is  whether this Court can supply the defective execution of a will ?    The question might be put broadly whether equity can do this under any circumstances, even when the failure of the will disappoints some *legal obligations ;* but it is sufficient to ask whether this can be done at the instance  of a  volunteer and for the mere purpose of giving effect to the intention  of  the  party.    I  apprehend  there can  be but one answer to this question.    The Statute of Wills is imperative as well on a court of equity as on a court of law ; and a failure to comply with its provisions can be supplied by

---

---

no jurisdiction whatever. Nor, it may be added, does such a power seem desirable. It is far better to sustain, uniformly, the policy of so important a statute, than to relieve particular instances of hardship arising from disappointed expectations.

It will be found on careful examination that the power of equity to enforce instruments or acts imperfect and void at law has been applied only to such instruments or acts as operate *between parties, inter vivos,* such as contracts, covenants, and settlements, the execution of powers &c. With respect to these no statute inter-poses to restrain the court from enforcing the obligations of parties or carrying into effect their intentions. But with testamentary dispositions the statute deals exclusively ; over these the Court has no control.

I do not say that a case may not be put in which relief would be given against *the consequences* of an imperfectly executed will ; as if a father, upon the marriage of a daughter, should agree to leave to her by will a certain portion, or as if a person should agree to compensate, by a legacy, service rendered. An obligation may thus be incurred, upon the failure to fulfil which, equity, after the decease of the contracting party, might decree an equiva-lent out of his estate ; but it would do this, not by way of setting up or giving effect to an imperfectly executed will, but, by decreeing compensation for the breach of the agreement. Its action would be not to enforce the *instrument* but the *obligation* of the party. In the present case it is not any obligation of Michael Robson that the Court is called upon to enforce, nor, under this head, is it to fulfill his mere intention, irrespective of any attempt made by him to execute it ; but the aid of the Court is invoked to give effect to these indorsements *as an imperfect execu-tion of what he intended to do,* and such effect can be given only by treating them as if they were a duly executed will.

But waiving this objection to the ground of equity now under consideration there arises another strongly urged by defendant's counsel and not satisfactorily answered, viz : that the *complainant is a volunteer and equity does not aid a volunteer*.

The case is urged as one of what are termed "imperfect gifts," which are cases of an attempt made to dispose of property by way of gift, assignment or release, but which fails at law through defect of some legal requisite. Equity, in such cases, is invoked to interpose and supply the defect or, which is the same thing, to enforce the gift notwithstanding the defects. Such a power this Court does exercise, and, properly applied, it is a most beneficent one. For it is applied, (subject to some exceptions to be presently noted,) only in order to enforce *obligations* and to protect *rights* already existing, but which through mistake, accident or neglect, lack the requisites necessary to give effect to them at law. In such cases equity intervenes ; but it does so to enforce an obligation, to protect a right, to prevent wrong and injustice, not, I may add, merely to carry into effect an unexecuted intention out of which no legal obligation has arisen. The power exercised is of the same nature with that by which equity enforces a specific performance, compelling a conveyance of title where the party has not conveyed it at law, but has brought himself under a legal obligation to do so. Hence it is laid down as a general rule that equity will enforce an imperfect gift or contract, or aid a defective conveyance or settlement only for a party claiming upon a consideration and not for a volunteer. This rule as a general one is so well established that authorities for it need not be cited. Now with respect to another question, viz ; what is *a sufficient consideration* to induce the Court to interpose in these cases ? There was at one time much doubt whether a mere *meritorious* consideration (such as the payment of existing debts or a provision for a wife or child) as contra-distinguished from a *valuable* considera-

tion, would induce a court of equity thus to interpose; especially when its aid was sought, not against the grantor or donor himself in his lifetime, but after his death, against those claiming under him, and who also stood in the relation of volunteers as to any *valuable* consideration. There is a strong weight of reasoning in favor of aiding a defective gift or conveyance under these last circumstances; and this view was adopted in an able opinion by Lord Ch. Sugden, in *Ellis vs. Nimmis, Lloyd & Gould,* 333. See also *Lewin on Trusts, Chap.* 9 *(24th Law Lib.)* But the weight of authority, since that case, is to the contrary and seems to establish the doctrine that a court of equity will exert this power only to enforce legal obligations, such as spring from a valuable consideration. *Holloway vs. Headington* 8 *Sim.* 325 ; *Jeffreys vs. Jeffreys* 1 *Cr. & Ph.* 138, and *Dillon vs. Coppin* 4 *Myl. & Cr.* 647, and see at large 1 *Story's Eq. Jur.* 793 *d.* 987. As the authorities stand, this must be accepted as the rule now prevailing.

I need hardly stop here to say that John Robson is a volunteer; that his claim does not rest upon a *valuable* consideration. He did indeed, after he came of age, render his father service; but this was while he was living with him and supported by him, and not under circumstances which could create any legal obligation on the part of the father. A valuable consideration must be such as creates a legal obligation. I cannot even say that it would be a case of *meritorious* consideration, if that were sufficient. For this also presupposes an obligation, though a natural or moral one, arising out of the dependent condition of the person to be provided for ; as a wife or a minor child. Mere relationship by blood of a person of age and capable of self-support does not impose that natural obligation from which springs a *meritorious* consideration.

There are, however, two classes of decisions under which equity has, even in favor of volunteers, enforced what at law would be imperfect gifts or assignments. We should,

in order to a complete examination of the subject, enquire whether the case before us can be brought within either of these classes. In the first of these classes of exceptional cases, it is held that a donor, without any effectual trans - fer at law of the subject of the gift, may constitute him- self a trustee of it, so that although no title passes at law the gift will be enforced in equity as the subject of a trust. This doctrine springs out of a distinction first declared in *Ellison vs. Ellison*, 6 *Ves.* 656.   In that case Lord Eldon held that although equity would not, for a volunteer, en- force a covenant for an assignment or settlement while it remained executory, yet that if a trust is effectually created, even without consideration, there results to the *cestui que trust,*   though but a volunteer, present vested rights, which equity will protect by enforcing the trust. And, in a subsequent case, *Exparte Rye,* 18 *Ves.* 149, the same Judge decided that a party may, though retain- ing the title in the property at law, *constitute himself a trustee,* and that a court of equity will execute the trust in favor of a volunteer.   The same principle was applied in *Wheatly vs. Purr,* 1 *Keen* 551 ; afterwards, by a liberal extension of the principle applied in *Exparte Rye,* it came to be considered that a simple declaration of trust by a donor was in equity equivalent to a transfer of the legal interest in a court of law, a declaration of trust, though voluntary, being considered as a complete and irrevocable transaction, vesting of itself an equitable right in the *cestui que trust,* and not like an unexecuted voluntary agreement which is incomplete without the aid of a court of equity. *Collinson vs. Patrick,* 2 *Keen* 134 ; also *McFad- den vs. Jenkins,* 1 *Hare* 458 ; and on appeal in 1 *Phillips* 153. The doctrine that a voluntary declaration of trust is sufficient in equity to transfer title, abstractly dated, may be unobjectionable, but in applying it, some late cases have gone a great way in holding that as to *personalty,* a donor may by a mere parol declaration of trust, without writing, constitute himself a trustee for the donee, and so

make in equity a valid gift though passing no title at law.
See *McFadden vs. Jenkins*, referred to, and the cases there
cited.

Lord Cranworth, in a very late case, *Jones vs. Locke*,
decided in 1865, *L. R.* 1 *Ch. Ap.* 28, speaks of these last
decisions as "unfortunate"; and their soundness may well
be questioned.

But, accepting this doctrine of voluntary trusts to
the full extent to which it has been carried, still it does
not reach the case before us. For all the decisions on
this subject proceed upon the principle that the donor, in
order to create effectually a trust, whether in himself or
in a third person, *must have intended to put the subject of it
wholly out of his own dominion, that is, as the owner of it.*
To constitute himself the trustee of property remaining
in his possession and not transferred at law, it must appear
from his acts or declarations that he intended to part with
his former ownership of the thing and to retain only the
legal title and control which belongs to a trustee, pre-
cisely such as would pass to a third person taking as a
trustee in the first instance.

The necessity of a clear intention on the part of the
donor to part with the entire control of the subject of
the gift, in order to create a trust of it, is well illustrated
by *Hughes vs. Stubbs* 1 *Hare* 476, a much stronger case
in favor of a trust than is the present one. A testatrix
drew a check on her bankers for £150 in favor of Mrs.
Gelding, and verbally directed her to apply that sum or
so much of it as might be necessary to make up to a
legatee the difference in value between a legacy of £100
which she had by will given to the legatee and the price
of a £100 share in a certain railway; the testatrix inform-
ing Mrs. Gelding that she had intended to give the share
instead of the legacy, but she did not think it necessary
to alter her will; and the banker gave credit to Mrs.
Gelding for the £150. In a suit for administration of the
testatrix's estate, it was held that there was no trust

created for the benefit of the legatee in respect to the £150 *as it could not be inferred from the facts that the testatrix meant to place this disposition of the £150, out of her own control in her lifetime.* The principle here applied answers the question whether Michael Robson so dealt with these bonds as to create a trust in equity though not a complete gift or release at law. He never divested himself, nor so intended to do, of his former property in and control over them during his lifetime. The indorsements, under the construction I have felt obliged to give them, had no such effect ; nor, as we have seen, was there a sufficient delivery of these bonds to Mrs. Surgen to work such a result. It is clear therefore that equity cannot execute this imperfect gift on the footing of a trust arising out of the mode in which Michael Robson dealt with the bonds. The case in this respect is precisely like *Antrobus vs. Smith,* 12 *Ves.* 39, where a father, having shares in a navigation company, indorsed on a receipt for the subscription an assignment of the stock to his daughter, but kept the paper in his possession until his death. It was argued that the indorsement operated as a declaration of trust ; but Sir Wm. Grant on this point says, "Mr. Crawford was "no otherwise a trustee than as any man may be called so "who professes to give property by an instrument incapa- "ble of conveying it. He was not in form declared a "trustee, nor was that mode of doing what he proposed in "his contemplation. He meant a gift. He says, he assigns "the property. But it was a gift not complete ;" what terms more apt could be applied as to the effect of the indorsements on John Robson's bonds?

The other class of exceptional cases referred to, in which equity will, for a volunteer, aid a gift incomplete at law, are those in which it has been held that the delivery by a donor in his lifetime, by way of gift *causa mortis*, of a chose in action not passing at law by delivery only, entitled the donee after the donor's death to call on his executors or administrators to make an assignment at law

or to allow to the donee the use of their names for the collection of the debt.

This doctrine was first announced by Lord Hardwicke in *Snellgrove vs. Bailey*, 3 *Atk* 214, which was the case of a bond delivered as a gift *causa mortis* to a third person, not being the debtor. The Court there held that, inasmuch as the bond could not be collected without profert (such was then the law) and the collection of the debt was inseparable from the possession of the instrument, the delivery of the bond might be considered to pass an equitable interest in the debt and on the donor's death without revocation to raise a trust between the executor or administrator and the donee which equity would enforce. And besides there being, at that period, no legal form for assigning a specialty debt, the delivery of the instrument was all that could be done by the donor towards completing such a gift.

Following this decision of Lord Hardwicke was a long struggle as to the application of the same doctrine to mortgages, which finally ended in the case of *Duffield vs. Elwees*, in the House of Lords, 1 *Bligh's New Rep.* 497, in which, in an opinion by Lord Eldon, it was held that the mere delivery of a mortgage *i. e.* of the investment, as a gift *causa mortis* passed on the donor's decease without revocation an equitable title, and that equity would compel a conveyance by the heir on the footing of a trust. Since the last case, by an easy extension, the same principle has been applied to all *choses* in action not passing by mere delivery, to unindorsed notes, bills, &c. In some of the States, as in Maryland, the doctrine of these decisions is rejected. If it stood merely upon the technical ground on which Lord Hardwicke applied it to a bond it could not now be sustained ; for ~~forfeit~~ of a bond is no longer essential to a recovery ; and, it may be added, the statutory provision for assigning specialties enables the donor in his lifetime to make the gift effectual at law. But the doctrine, in the later cases, rests upon and is well

supported by broader considerations.   For, under the cir-
cumstances in which gifts *causa mortis* are usually made
the delivery *of the instrument* is all that in ordinary cases
is practicable or convenient ; and a clearly proved delivery
of this is a sufficient security against fraud.   At the same
time securities of this nature may often be the most con-
venient species of property to answer a donor's purpose.
It seems reasonable not to require, in order to the validity
of such gifts, more than what is necessary as a check
against fraud ;  and for this the delivery of the paper
clearly proved, with its purpose, seems sufficient.

But it concerns us, for the purposes of the case before
us, to note that, in applying this doctrine, equity *never aids
the gift by supplying the want of a sufficient delivery*.   The
doctrine proceeds on the ground that the gift is already
complete ; that it was completed by the delivery of the
instrument in the donor's lifetime.   Equity interposes,
not to perfect the gift by supplying what the donor has
omitted, but only to make the gift fruitful, to enforce what
it treats as an incident or consequence of the gift, *i. e.* in
the case of a bond, the use of the executor's or adminis-
trator's name to collect it ; or, in the case of a mortgage,
the conveyance of the land in execution of the trust
resulting from the delivery of the mortgage.

In the present case there was no delivery of the bonds
by Michael Robson to John Robson or to his use ; no
completion of the gift by Michael Robson.   There is
wanting the basis of fact on which the doctrine of the
cases referred to rests.

We must then treat the case before us as within the
general rule that equity will not, for a volunteer, aid a gift,
imperfect at law.   And now it will be interesting and
pertinent to observe how rigorously, in the course of deci-
sions, this rule has been applied to cases similar in general
features to the present one, *i. e.* cases of gifts attempted
to be made in contemplation of death but failing, as gifts
*causa mortis*, for the want of a sufficient delivery.

11

In *Autrobus vs. Smith,* 12 *Ves.* 39, a father holding certain shares of stock indorsed on a receipt for the subscription an assignment to his daughter ; yet his retaining possession and control of it during his life was held by Sir Wm. Grant a defect in the gift which equity could not supply, even by treating the assignment as a declaration of trust. There was in that case the additional objection arising out of a strong doubt whether the father did not in his lifetime change his mind, but the same feature will be found to mark the case before us.

In *Tuffnell vs. Constable,* 8 *Sim.* 69, a creditor of the complainant, Tuffnell, held his bond for £1200. He signed an indorsement on the bond formally releasing £700 of the debt, stating that in consequence he had that day revoked a legacy to Tuffnell of the like amount ; which was the fact. The bond remained in his possession until his death and his executors proceeded to collect it. The V. C., Sir L. Shadwell, refused to interfere, stating that the complainant "gave no consideration for the alleged "release, and that as he was a volunteer he had no right "to come into equity for relief."

In *Dillon vs. Coppin* 4, *M. & C.* 647, a father attempted by a deed poll, which at law was inoperative for the purpose, to settle certain stocks on a married daughter, a Mrs. Coppin, for whom at marriage he had made no provision. To other daughters he had made advances at their marriage ; and his object was to place all his daughters on an equal footing. The deed poll was prepared by a solicitor and formally executed, but was never delivered to Mrs. Coppin or her husband and was found in the father's possession at his death, sealed in an envelope, on which in his handwriting was indorsed "Papers concerning Mr. and Mrs. Coppin and their chil- "dren in regard of their being no settlement made on them "at the marriage. To be given up to Mrs. Coppin at my "death, and immediately. Drawn by Mr. Evans, Solicitor,

"Bath.   Dated August 25th, 1831."   At the execution of the deed he evinced great interest in the matter and when it was over and, as he supposed, the object effected, said, "Thank God, this is now off my mind;" and he expressed much satisfaction in having provided for Mr. Coppin, his wife and family.

In this case the power of the Court to aid imperfect gifts was thoroughly discussed, including the question how far a meritorious consideration would avail, it being an attempt to provide for a daughter; also, whether the father had not done enough to make himself a trustee for the daughter.   But Lord Chancellor Cottenham, held that the deed was inoperative at law, that no trust was created, and that equity could not relieve.   With respect to this case of *Dillon vs. Coppin*, the editor of Redfield's Edition of 1 *Story's Eq. Jur. Sec.* 793 *c.* states that in *Kekewich vs. Manning*, 1 *De Gex. M. & G.* 176, Lord Justice Knight Bruce in an able review of all the cases on this subject had considered *Dillon vs. Coppin* as "not "being in accordance with the course of decisions."   This remark is inaccurate, as appears from an examination of the opinion of Ld. Justice Knight Bruce.   He cites *Dillon vs. Coppin* as among the class of cases in which attempts at a gift or settlement have been held insufficient to create a trust, and without impeaching any of those cases he concluded that other decisions under which trusts were held to arise were more applicable to the circumstances of the case before him.   And in this connection it should be noted that, among the great number of cases on this subject, any apparent conflict of decisions has turned only upon the question whether in the particular case the gift was or was not imperfect, whether what had been done was or was not sufficient to pass an interest at law, or to create a trust in equity.   There has never been any difference of opinion as to the rule that if the gift *is imperfect*, equity will not interfere except to protect rights springing from a consideration, or unless sufficient has

been done by the donor to raise a trust. All the cases stand together upon this rule, but sometimes differ as to whether, by certain acts, a gift is or is not sufficiently perfected to pass an interest at law or to create a trust in equity.

The complainant's counsel took the position that although an imperfect gift or conveyance will not be enforced against the donor in his lifetime, yet that, after his death, equity, in consideration of his intention, will enforce the gift or conveyance as against his representatives. To this 1 *Sto. Eq. Jur. Sec.* 433 note, was cited. The position does not seem to be sustained by the reference, nor by any authorities elsewhere; and it is in conflict with the whole course of decisions. There is but one instance in which a gift revocable by the donor in his lifetime can be enforced against his representatives ; and that is the ordinary case of a gift *causa mortis*, which from its nature is revocable by the donor while he lives, but if not revoked passes an absolute interest at his death. The conclusion upon the ground of relief now under examination is, that,there being no delivery of John Robson's bonds to him or for his use in Michael Robson's lifetime, the only act by him to aid which a court of equity can be invoked is the making of the indorsements on the bonds, that effect cannot be given to these by way of assignment or release operating presently or as a gift *inter vivos*, for, irrespective of John's being a volunteer, such was not the purpose or intent of the indorsements, but the very contrary ; and equity where it gives effect to an imperfect instrument can do so only according to the intent of the party making it ; that these indorsements were intended to discharge John at Michael Robson's death; that for such a purpose they are inoperative at law as a will, for want of the statutory requisites, or as a gift *causa mortis*, for want of a delivery ; that neither of these defects can a court of equity supply ;—further, that no trust has been

created. The complainant therefore cannot be relieved upon the third ground of equity relied on.

IV. The fourth and last ground of relief insisted upon at the bar is that Michael Robson, having in his lifetime treated these bonds as *functus officio* or discharged, (and whether this were by payment or voluntary forgiveness it matters not, )a court of equity, in consideration of his intention, and even without any act of release sufficient in law or which equity could give effect to as a release operating in his lifetime, will after his death treat them as he himself did, *i. e.* as discharged or not obligatory.

The principle invoked under this ground of relief is suggested as one *peculiar to the relation of debtor and creditor*, and as giving effect to the mere intention of the creditor, even without any specific act of release or attempted release,—the intention being gathered from his course of dealing with the debt and being open to proof by any mode of evidence, parol or otherwise. Now to the application to this case of such a principle, were it ever so well established, two objections arise out of the proof.

1. Michael Robson did *not* in his lifetime treat these bonds as being *then* discharged or forgiven. His intention was directly the contrary, *i. e.* to hold them in force while he lived. All that the case presents at the best is an intention, ineffectually executed, that they should be forgiven *at his death*. Such an intention, *as mere unfulfilled intention*, the Court has no power to execute short of making a will for him ; and this is a proposition not to be entertained. Nor can the Court, as has been already fully discussed, aid the imperfect attempt made by Michael Robson to execute his intention. On this point the case s similar in princ iple though not so strong in its circumstances, to *Tuffnell vs. Constable*, before cited, in which a deceased creditor had indorsed and executed on the bond a formal release, but without delivery, directing that it should be delivered *at his death*. Here was, beyond all

doubt, an intention to discharge the bond at the creditor's death, yet the Court would not give effect to it.

2. On another point of fact the principle relied on, even if tenable, would fail to reach this case. If in any case the Court can hold as discharged a debt due to a decedent on the ground that he himself so treated it, giving effect not to any specific act of release but to his intention that it should not be collected, there must at the least appear to have been *a fixed, abiding intention, continuing until death, to forgive the debt.* But Michael Robson's intention to forgive this debt, though it was quite settled at the date of the indorsements and for some time after, became before his death fluctuating and doubtful. The evidence on this point has already been stated. It is true, he did not cancel the indorsements ; and if they had of themselves any legal operation this would have remained unaffected by the unsettling of his purpose ; but the ground of equity, now considered, proceeds upon the concession that these indorsements in themselves were ineffectual, and that it is the intention unfulfilled at law which equity, under the circumstances, may execute. In this view any change of Michael Robson's purpose becomes material.

3. But further, after much reflection, the doctrine seems to me unsound and not supported by authority, that a court of equity will, under any circumstances, hold the debt due to a deceased person discharged on the mere ground of his intention not to enforce it, or of his treating it as not obligatory, even in his life time. There are appropriate and suitable modes for the legal discharge of the debt ; as by a formal release, cancellation, or surrender ; and where through mistake or inadvertence an attempted discharge fails at law and a consideration exists, creating a right to the discharge which equity ought to protect, then a court of equity can enforce the defective attempt to discharge the debt. But where no effectual attempt has been made, or none which equity, on the principles before stated, can aid, then to give effect to an

unexecuted intention, and this to be collected from general evidence, from acts *in pais* and declarations of a deceased person, which, at the time, were not specifically directed to any such result and which the party whose estate is to be affected is not here to explain or rebut, would be to open a wide door to frauds and to deal altogether too loosely with the estates of decedents.

The exercise of such a power by the Court does not, upon careful examination, seem warranted by the four cases cited to support it. One is *Wickett vs. Raby 2, Bro. Parl. Cas.* 386. This was a claim by one Raby to be discharged from a bond debt due to Walter Piggott, deceased, and to have the bond surrendered by the executor. The Court sustained the claim—on what ground does not certainly appear, no reasons for the decision being reported. But the argument for the debtor claimed that certain declarations and directions of the creditor respecting the bond in his lifetime, together with an acknowledgment by the executrix after his death and her express promise to to deliver up the bond, were evidence sufficient of a trust created in her for that purpose, and it was in execution of a trust, not of a mere intention to forgive, that the interposition of the Court was sought. It is reasonable to presume that the decision rested upon the grounds argued ; and, if so, it does not establish the principle now under consideration or any principle applicable to the case before us. One cannot but observe that the facts as reported in *Wickett vs. Raby* do not afford sufficient evidence of a trust. The report of the proof may be imperfect ; but at all events it is only with the principle decided by the case, and not with the correctness of the construction given to the facts, that we are concerned.

Another of these cases is *Eden vs Smyth,* 5 *Ves.* 341. That arose on a bill filed by Eden against the executors of Smyth, his father-in-law, for payment of a legacy of £1000, under Smyth's will. The residue was given to

Eden's children. The executors resisted payment of the legacy on the ground that Eden was indebted to the testator in three sums, viz : One sum of £1000 for money loaned at Eden's marriage and for which the testator held his bond ; another sum of £900, which was made up of £200, loaned to Eden by the testator, for which no bond was taken, and £500, with which the testator had paid a bond of Eden to a third person, but without taking an assignment of the bond; the other sum was £1000, for which the testator had become surety of Eden in a bond to a Mr. Boucher, but which had not been paid up to testator's death, his estate being bound for it. All these debts ·amounted to £2,900. So that if Eden were held charged for them he would, after setting off the legacy, remain indebted in £1,900.

Now, the great question in that case was as to the *construction and effect of the will ;* whether the legacy was meant to be actually paid, as it was in fact expressly directed to be within twelve months ; and whether in the "residue" given to Eden's children the testator meant to include these claims against the father. It was held by the Lord Chancellor, Loughborough, that on the face of the will *prima facie* the legacy was to be paid clear of any deduction, which was all the bill sought ; that the only doubt as to this arose from collateral papers found in possession of the testator, *i. e.* Eden's bond to the testator for £1000, and his bond to a third person for £500, which testator had paid off; and that the doubts arising from his possession of these papers might be and were rebutted by other collateral papers, letters, memoranda &c., of a very conclusive character, shewing that his intention was to have the legacy paid clear of any claim on the part of his executors. The effect given to the evidence was to sustain the *prima facie* construction of the bequest ; and the ·bequest thus construed, not the collateral proof, operated as a discharge.

The Lord Chancellor further held that on another ground all this collateral evidence of testator's intention as to the bonds was admissible, *i. e.* to shew what he meant to be the estate disposed of and to pass under the term, "residue." The evidence, therefore, of the testator's intention in that case not to enforce his claims against Eden and of his dealing with the claims as already discharged was admitted, not for the purpose of treating the claims as discharged on the mere footing of testator's intention to forgive them, but in order to sustain the *prima facie* construction and effect of the will, by force of which it was that these claims were discharged.

This general view of the effect of the proof in *Eden vs. Smith* was sufficient to dispose of that whole case. But the Lord Chancellor in his examination of the evidence found to his satisfaction that each of the claims against Eden had been discharged upon special grounds in no way applicable to the case before us. He held (1) that as to the £1000, bond given to the testator there was evidence sufficient of an actual release pleadable at law. Further, he held that as to Eden's bond given to a third person and paid off by the testator, the testator's omitting to take an assignment was evidence that the money was applied to this bond as a gift to.Eden. The same view he took of the £200, advanced by the testator to Eden without the taking of any bond. Consequently as to these two sums no liability on the part of Eden to the testator ever occurred—and lastly, as to their joint obligation to Boucher for £1000, in which testator was surety, the Lord Chancellor held that it being unpaid at the testator's death and no liability having as yet accrued on the part of Eden *to the testator*, the evidence was admissible and sufficient to shew that the testator considered this bond as *his own debt*, and to be paid by his executors in relief of Eden.

This case, therefore, of *Eden vs. Smith*, affords no authority for the doctrine involved in the complainant's ground of relief now under consideration.

12

The next of the cases cited is _Flower vs. Martin_, 2 _Myl. & Cr._ 459. This was a suit amicably instituted to try the question of the plaintiff's liability on a bond for £6,000, held by by his father, Sir Chas. Flower.   It was a bond given on the occasion of the father's reconciliation with the plaintiff after an estrangement caused by his extravagance and dissipation.   The money was applied to pay his debts.   The bond for the amount was given under an arrangement proposed by two friends who acted as mediators, and it was to remain in their possession, not to be enforced without their consent and to be cancelled at their discretion at any time within six years. It never was in the father's possession ; he received no interest on it ; made no reference to it in the written statements which he periodically made of his estate ; and when it was executed he expressed his intention that it should never be enforced if the plaintiff's conduct should be satisfactory to him.   Lord Cottenham held that the bond was, in fact, given not as security for a debt but for a collateral purpose, viz : as a check upon the son's conduct ; that this having been satisfactory to the father until his death, the object of the bond was fulfilled ; that equity, treating it according to its original and real purpose and meaning, would not allow it to be enforced. This was the application of a very clear principle, viz : that instruments, whatever may be their form and effect at law, are to be construed and enforced in equity according to their real meaning ; a principle having no application to the case before us.   But Lord Cottenham _does_ proceed to say that even "if the sum constituted a debt in the first in- " stance, the debtor, _according to the authorities_, is at liberty " to shew that the creditor subsequently altered his inten- " tion and treated it as a gift," and we are led to infer that the Lord Chancellor would have held the bond, considered even as a debt, discharged by evidence of the father's mere intention to forgive it, without any act of release sufficient as such at law or in equity.   He rests this posi-

tion on *Wecket vs. Raby* and *Eden vs. Smyth*, the two cases before reviewed. Now that they do not sustain the position must be apparent from the examination of them already made. It seems probable that the learned Chancellor in *Flower vs. Martin*, having so clear a ground of equity as the one first stated by him, *i. e.* the collateral purpose for which the bond was at first given, was not led critically to examine the cases of *Weckett vs. Raby* and *Eden vs. Smyth* cited before him to the other ground.

The last of the cases referred to by complainant's counsel is *Aston vs. Pye*, cited in 5 *Ves.* 354, by Lord Loughborough from his note book. It is very briefly stated. It was a suit in the court of common pleas directed by the Master of Rolls on Pye's note by the executors of the creditor. The defense was a release, of which the evidence was claimed to be an entry in the testator's books made thus, "Pye pays no interest nor shall I ever take the "principal except greatly distressed." At first the Court held this entry not to be a release but a testamentary paper, to be proved in the ecclesiastical court, and adjourned the case that probate might be made. But the ecclesiastical court refused probate. Then the court of common pleas, considering that the entry must of necessity operate as a discharge in some way, and that under the decision of the ecclesiastical court it could not operate as a testament, gave effect to it as a release at law. Lord Loughborough, who sat in this case, owned that he did not concur in the decision, but acquiesced because it was just under the circumstances, the testator being in affluent circumstances, and having never demanded interest.

It must be admitted that *Aston vs. Pye* in its facts was no stronger for a discharge of the debt than is the present case. But *Aston vs. Pye* is a slender authority ; it is meagerly stated from a judge's note book, disapproved by the Chief Justice who sat in it, decided without deliberation, and carrying the effect of the entry made by the creditor to what we must pronounce an absurd conclusion,

even holding it to operate as a release in a suit at law. This case, even aided by what fell from Lord Cottenham in *Flower vs. Martin*, is not sufficient to sustain the doctrine on which the complainant's last ground of equity was vested.

Upon the whole case, the conclusion is that the bonds of John Robson remain in full force for the amount of principal and of interest unpaid ; and that the injunction so far as it restrains the collection of this amount must be dissolved.