# ORPHANS' COURT OF BALTIMORE CITY.

Filed May 13, 1900.

## IN RE ESTATE OF MATILDA W. GIES.

*Vernon Cook*, of *Gans & Haman*, for the petitioners.

*J. Cookman Boyd* for the respondents.

SAVAGE, C. J., BLOCK, J., concurring—

We wish to note and commend the ability with which this case was argued. We have given it careful examination and consideration. The facts are not numerous, and save those related by the two witnesses who were called by the respondents are of record in this Court and contained in the paper-writing hereinafter set forth.

On the afternoon of Sunday, October 30, 1898, Miss Matilda W. Gies, aged between sixty-five and seventy years, came to this city from Washington, D. C., in company with a relative, Mrs. Malinda J. Warren, who had been requested by Miss Gies to come to Washington for her, and together they went without delay in a carriage to the then residence in Baltimore of Mrs. Warren and her husband, Aaron Warren, who hospitably entertained her. She was, according to the testimony of Miss Mary J. Warren, a daughter of Mr. and Mrs. Warren, and sole witness in this case except Mr. John S. Deale hereinafter mentioned, "suffering from dropsy," but she was apparently at that time in no immediate danger of death, and did not, as far as Miss Warren's testimony disclosed, say anything to indicate that she anticipated her demise within a brief time. No testimony was offered as to her mental condition, and we presume it was sound. Soon after Miss Gies reached the home of Mr. and Mrs. Warren she said to Mrs. Warren (without a suggestion from any one, as far as shown): "Malinda, all I have is yours; you and Aaron shall have it all." After taking supper on the day of her arrival she again said to Mrs. Warren: "Malinda, I am very grateful to you; you shall have all I have, every cent of it." She then handed to Mrs. Warren the key to her trunk, and said: "Go get my bank book out of my trunk." Mrs. Warren brought her bank book to her, and she handed it to Mrs. Warren, and said: "Malinda, that is yours." Miss Gies then retired to the room assigned her, and she never left it. She died on November 10, 1898, twelve days after she reached Balti-

more. She was not in bed during the entire time she was in her room, but occasionally walked about it. Mrs. Warren was her constant nurse. The testimony of a physician was not offered.

On October 31, 1898, the day after Miss Gies reached the home of Mr. and Mrs. Warren, Mr. Aaron Warren presented to her a paper writing which he had prepared, and of which the following is an exact copy:

Baltimore Oct 31st, 1898.

To paying teller

Dear Sir:

I hearby transfer my bank account, (In case of death,) to Mrs. Malinda J. Warren and husband, Aaron Warren of Baltimore Md. of whom I am now living.

Miss Gies signed her full name to the above paper writing. It was not witnessed, but Miss Warren testified that she saw Miss Gies sign it. It is without a seal. It is unquestionably not a will. The bank book and the writing were retained by Mr. and Mrs. Warren without objection or other words or acts of Miss Gies as far as is known to us. Mr. and Mrs. Warren are incompetent as witnesses under Section 2 of Article 35 of the Code, and were not called. The case must be decided by us without even a conjecture as to what they might have said under oath.

On November 12, 1898, as we were informed through the testimony of Mr. Deale, assistant treasurer of the Eutaw Savings Bank of Baltimore, Mr. and Mrs. Warren presented to the careful and experienced officers of that long-established corporation the bank or deposit book of Miss Gies, which showed that the balance in bank to her credit stood in her name alone and that no rights of joint ownership or survivorship attached to it, and the paper writing now before us, and requested payment to them of the entire sum of money (which then amounted to $2,-035.22), standing therein to the credit of Matilda W. Gies. Payment to them as individuals was promptly and rightly refused.

On November 17, 1898, letters of administration on the estate of Matilda W. Gies were granted by this Court to Aaron and Malinda J. Warren on their application in person, and on Novem-

ber 18, 1898, the Eutaw Savings Bank of Baltimore paid to them, as such administrators, the above-mentioned sum of money, by check No. 290, drawn on the Western National Bank of Baltimore to their order as administrators, and which they endorsed as administrators. They thus became possessed of the entire fund.

No inventory of the estate of Miss Gies has been filed in this Court, and though it consisted of the above named sum of money one is necessary (Art. 93, S. 221). On June 19, 1899, Mr. and Mrs. Warren filed in this Court their first administration account, in which, after charging themselves only with $2,035.22 (the amount paid to them as before stated) they craved allowance for funeral expenses, debts, $50 for a tombstone erected to the memory of Miss Gies, and full commissions to themselves, and balanced their account by this entry: "Amount remaining in hands of these accountants pending controversy as to ownership of fund $1,363.34." On the same day after Mr. and Mrs. Warren had signed the above account as administrators of Matilda W. Gies, and sworn that it was "true and just as stated" it was examined, proved and passed by this Court and immediately filed and recorded. The testimony of Miss Warren and Mr. Deale and the written proof in this case embody the above recited facts.

Mr. and Mrs. Warren rested after proving and filing their first and only administration account, and we were not formally apprised until December 23, 1899, that the "controversy" had reached an acute stage, and then by the filing by Messrs. Gans & Haman, attorneys for Rachel W. Werntz and eight others who claim as distributees of said estate, of a petition in which after complaining of the unusual delay of the respondents and their verbal claim that they were entitled to further time in which to state another account, they allege "that it has also been claimed on behalf of said administrators that said administrators themselves are entitled to the balance of $1,363.34 shown by their first administration account, but your petitioners have been unable to learn definitely upon what grounds such claim is based, and aver that no just grounds exist for such claim." In conclusion the petitioners prayed for an order requiring the said

administrators to state a second account at once "accounting for and distributing the balance in their hands and interest."

The answer of the respondents denied that the petitioners are distributees of said estate, and also that their first account showed "a balance for distribution," and concluded with the statement that the amount of money remaining in their hands "belongs to Malinda J. Warren," and that the estate of Matilda W. Gies is indebted to her for payments made by the administrators on account of the estate. The matters in controversy when argued stood as above detailed, and we have stated them in full in order that the essential facts may be herein set forth as presented to us and the legal questions involved may be the better understood.

We will leave out of extended consideration the question, forcibly suggested to us and briefly argued by the attorney for the petitioners, of the estoppel of the respondents by their receipt in their capacity as co-administrators of the whole fund found in bank and their subsequent accounting, in an account which they declared under oath was "true and just as stated," for disbursements and for a balance of $1,363.34 remaining in their hands "pending controversy as to ownership of fund." We will content ourselves with the statement that it is "a general principle of law that an executor or administrator of property into possession of which he has been let under the will or letters of administration is, like a tenant, estopped while he continues in possession from disputing the title of his testator or intestate; and this is true even of the widow of such representative of the estate when claiming under a title of her husband. The property must be surrendered and administration abandoned before the estoppel is removed." Bigelow on Estoppel, 5 Ed. 554. In brief, the possession of the co-administrators of the estate of Matilda W. Gies was and is still the possession of the estate, and they cannot now set up a claim of title adverse to the estate. This is a familiar principle and is fully sustained by the authorities.

The respondent, Malinda J. Warren, now alone claims the entire balance of $1,363.34 as belonging to her individually, and, according to the tenor of her answer, has assumed to decide the "controversy" by not only excluding all who claim as distributees, but also her husband and co-administrator, who was mentioned by Miss Gies in her first reported statement as one upon whom she also desired to bestow her estate, and is named in the paper-writing signed by her as equally entitled with his wife. Mr. Warren is silent as to his rights. Mrs. Warren is still an administratrix of the estate of Matilda W. Gies, and as such is subject to the laws governing the conduct of administrators, and to the orders of this Court. Her claim, though alleged in her answer to be an individual claim, is that of an administrator against the estate held by her as administrator, and in order to assert her claim in this Court she must first obtain our approval as is required by Section 96 of Article 93 of the Code, which is as follows: "In no case shall an administrator be allowed to retain for his own claim against the decedent, unless the same be passed by the Orphans' Court, and every such claim shall stand on an equal footing with other claims of the same nature."

She has not complied with the above quoted section, but has retained in her hands the admitted balance, rendered no second account though admittedly all debts (unless her claim for money expended now made be approved) have been paid, and has simply allowed the estate entrusted to her to remain unsettled. Her positions as an administratrix and as an individual are plainly inconsistent and equally untenable. This Court cannot consent to her assumption of a dual capacity or acquiesce in her inertness, and will order a further accounting.

But her legal adviser has earnestly contended that she took the whole fund found in bank as a *donatio mortis causa*, and that now, notwithstanding her receipt for it as a co-administrator of the estate of her decedent and her subsequent accounting as herein stated, she can alone claim the whole balance in hand by virtue of the statements of Miss Gies made to her, the delivery to her of the bank book, and the paper-writing offered in evidence. The claim comes late. The question of the title to the fund could have been submitted to a Court of equity upon a bill of interpleader filed by the Eutaw Savings Bank by request when payment was

refused, and "ownership of the fund" was mooted and denied to the respondents.

We will examine the ever interesting question of a *donatio mortis causa* in the light of the facts of this case and of the controlling authorities and decisions. The law does not favor such gifts. They are anomalies in law and need to be scrutinized; every circumstance and statement surrounding them must be considered and weighed, and indisputable proof is required to sustain them. However clearly the intention of a would-be-donor may be expressed and proved it cannot be effectuated save according to every requirement of law. A learned writer pertinently wrote of them in the Atlantic Reporter in November, 1852: "The *donatio mortis causa* is one of those perplexed topics in the law which are at once the despair of judges and the delight of the law schools. On either side, most of the questions which may arise within its fortunately narrow range, cases could be found to support an argument which might embarrass it if it did not convince. Its very definition, indeed, and the fundamental idea which it involves are still, after a century of discussion, quite unsettled." And after carefully tracing its introduction into the Roman law and its reluctant admission into the common law of England, he concludes as follows: "It has been the fruitful source of litigation, of those contests which, with their recriminations of perjury and fraud, have embittered families and disgraced society. It has, on the other hand, nothing to recommend it beyond what has already been provided by the ordinary testamentary legislation, nor any convenience to counterbalance the dangers by which it is accompanied."

We will add here the forcible language employed by Chief Judge McSherry, and the apt quotation made by him, in the leading case of Whalen vs. Milholland, 89 Md. 199. "The facility with which such gifts may sometimes be proved is suggestive of great caution in weighing the evidence adduced to maintain them. To doubt them ought to be to deny them. 'Around every other disposition of the property of the dead the Legislature has thrown safeguards against fraud and perjury; around this mode (*donatio mortis*

*causa*) the requirement of actual delivery is the only substantial protection, and the Courts should not weaken it by permitting the substitution of convenient and easily proven devices.' Keepers 'vs. Fidelity Co., 56 N. J. L. 392; S. C. 23 L. R. A. 184. Mindful of the facility with which, after the alleged donor is dead, fraudulent claims of ownership may be founded on pretended gifts of his property, asserted to have been made while he was living, it is but a salutary precaution which demands explicit and convincing evidence of every element needed to constitute a valid donation *inter vivos* or *mortis causa*. Even then fraudulent claims may prevail, but the rigid requirement of the clearest proof will at least diminish the number."

In order to apply to the claim in this case the decisive tests we must first consider the nature and requisites of such a gift. In our researches we have found in the exhaustive opinion filed in the case of Robson vs. Robson's administrator, by Chancellor Bates, an able lawyer, and reported in 3 Del. Ch. 51, the best statement of them. It is as follows: "A gift *mortis causa* has some of the properties in common with gifts *inter vivos*, and some in common with legacies, but in its essential properties it is testamentary, being made in consideration of the donor's death and being in the meantime revocable. It is, in fact, one of the exceptions (*nuncupative* wills being the other) to the policy of the statute of wills which requires dispositions of property intended to take effect after death to be made in writing, signed by the party making them, and attested by two witnesses—an exception originally allowed as a concession to those who through sickness or some impending danger were disabled from making a formal will. Hence the validity of such a gift is subject to these conditions: First. It must be made "in peril of death." Secondly. To guard against fraud and supply an equivalent to the written evidence of intention an *actual delivery* of the property is required. Thirdly. Upon the recovery of the donor and his consequent ability to comply with the statute the dispensation from its requirements ceases, and a gift *mortis causa* though valid when made becomes of no further force. No express condition to this effect is necessary."

Let us apply to the claim of Mrs. Warren the "conditions" correctly stated by Chancellor Bates. We are unable to determine from the unsupported testimony of Miss Warren that Miss Gies was at the time she spoke the words repeated to us by her, or when she signed the paper writing before us, "in peril of death" in the legal sense demanded in such cases as the one at issue. No reported words of Miss Gies justify the conclusion that she was "in peril of death" at that time, or believed herself so to be. Medical testimony was not offered, and Mr. and Mrs. Warren, being incompetent as witnesses, were silent. The only testimony as to her physical condition is contained in Miss Warren's statement that she was "suffering from dropsy," and all we know of any thought by Miss Gies of her death is expressed in the four words which appear in the paper-writing relied upon by the respondents. Her death at the end of the brief time she was a guest of Mr. and Mrs. Warren is not proof in itself that she was "in peril of death" at the times she uttered the words repeated to us, or when she signed the paper-writing presented to her by Mr. Warren. We are without positive knowledge of the exact character of her ailment, the dangers which attended it, or the cause of her death.

Now, as to the other conclusive test of "actual delivery of the property." Confessedly there was a complete failure to actually deliver to Mr. and Mrs. Warren the money of Miss Gies. There was no time at which Mr. and Mrs. Warren, though in possession of the bank book and armed with the paper-writing signed by Miss Gies, could have possessed themselves of the money in bank without a contest and a judicial decision in their favor. They accepted the view taken by the officers of the Eutaw Savings Bank, took without delay the necessary steps to obtain the authority of this Court to receipt for the "property" as administrators, received it as co-administrators, and so accounted for it under oath, and balanced their account by declaring under oath that they retained the balance "pending controversy as to ownership of fund." Miss Gies never parted with her dominion over her "property." She could at any time have drawn without question all of her money out of her savings bank, or disposed of it by

a valid will. Again we quote the language of Chief Judge McSherry, in Whalen vs. Milholland: "To make a gift perfect and complete, there must be an actual transfer by the donor of all right and dominion over the thing given, and there must be an acceptance by the donee or some competent person for him. In addition it is essential to the validity of such a gift that it should go into effect, or in other words transfer the property at once and completely; for if it has reference to a future time when it is to operate as a transfer it is nothing more than a promise without consideration, and cannot be enforced either at law or in equity. Until the gift is legally perfect and complete a *locus penitentiae* remains and the owner may make any other disposition of the property that he or she may think proper." And in Bunn vs. Markham, 7 Taunt 214, Gibbs, C. J., said: "There is no case which decides that the donor may resume possession and the donation continue." As Miss Gies died without attempting to dispose of her property by will it is not necessary to do more than refer to the third condition. We have no difficulty in deciding that no *donatio mortis causa* was made by Matilda W. Gies, and that she died possessed in law of her entire estate.

The attorney for the respondents has also contended that the possession of the bank book gave title under the printed rules and regulations of the bank thereto attached and the decisions of the Courts of other States, but upon an examination of the Maryland Reports we have found that in no case, save when the fund in bank was held as "joint owners," and those words written or stamped in the deposit book, has the mere possession of the deposit book been considered evidence of title. In this case there was no entry in the deposit book to show anything but the sole ownership of Miss Gies. The delivery of the bank book to Mrs. Warren must be taken in connection with the writing offered in evidence, and together, for reasons already given, they did not accomplish "actual delivery" of the fund in bank, or give legal grounds for the assertion at law or in equity of a right to its possession.

The respondents have also urged that this Court is without jurisdiction to consider and decide this case. Such contentions are not unfamiliar to us,

and while we will be always careful not to overstep the bounds of our judicial powers, we will be ever alert not to admit an unfounded claim that we are, by reason of statutory limitations, powerless to administer justice in a case of the character and based upon like facts now under considerations. The contention of the respondents is predicated upon the prevalent idea that this Court is without jurisdiction in all cases in which at any time a claim of title to property is made. That popular belief is erroneous and pernicious.

The initial fallacy of this contention of the respondents is that the question of title is not between Aaron and Malinda J. Warren as administrators on one side and the petitioners as distributees on the other, but between the Warrens individually on one side, and the petitioners as distributees on the other. Mr. and Mrs. Warren have not ceased to be co-administrators of the estate of Matilda W. Gies, and whatever they do until divested according to law of their capacity of coadministrators can only be done as such co-administrators. They cannot singly or together make a claim against the estate of their decedent as co-administrators, until they have complied with the requirements of the Code (Article 93, Section 96), as before mentioned, or as individuals until they divest themselves of their character of co-administrators. It is true that as a general rule this Court has no right to pass upon a question of title between an estate and strangers. But we are dealing now with exceptions to an administrator's account. Over such accounts this Court undoubtedly has jurisdiction. The language of the Code, Article 93, Section 230, is as follows:

"The Court shall have full power to take probate of wills, grant letters testamentary and of administration, direct the conduct and settling the accounts of executors and administrators, superintend the distribution of the estates of intestates, secure the rights of orphans and legatees, and to administer justice in all matters relative to the affairs of deceased persons."

Under that section this Court has a right to determine what are assets of an estate. In the oft-quoted case of Pole vs. Simmons & Pole, Extrs., 45 Md. 246, the exact question now presented to us was decided. Mrs. Pole filed a petition in the Orphans' Court of Frederick County charging that Mrs. Simmons, the decedent, had in her lifetime made certain advancements to several of her children, and that those advancements constituted part of the assets of the estate and should be brought in and accounted for in the estate. The administrators denied that said sums were advancements or constituted a part of the assets of the estate, and averred that they were absolute gifts to the persons to whom they had been respectively given. They also denied the jurisdiction of the Orphans' Court in the premises. The unanimous opinion of the Court of Appeals sustained the order of the Orphans' Court of Frederick County dismissing the petition of the administrators, and said in part: "It was contended that the Orphans' Court had not jurisdiction of this case because in deciding the questions presented by the petition and answers it had to construe the language and legal effect of the paper executed by Mrs. Simmons on March 3rd, 1866, as well as the release of the same date executed by her sons, also Mrs. Simmons' will, and from them to decide what is an advancement; whether the sums of money given by Exhibit No. 3 were advancements or absolute gifts and whether in any event they were assets of Mrs. Simmons' estate. And it was contended that they are questions which the Orphans' Court, under the limited jurisdiction conferred upon them by the Code, have no power to decide." The opinion then quotes Section 230 of Article 93 of the Code, as giving full power, and continues: "Having jurisdiction of the subject matter of controversy the Orphans' Court has the right to hear testimony and receive evidence in relation to it, and if the evidence consists of written instruments to examine and construe them, in order that it may properly apply it to the case before it." It thus appears from the case of Pole vs. Simmons & Pole, Executors, that notwithstanding the administrators set up an alleged gift, and claimed title in themselves as against the estate the Orphans' Court has jurisdiction to hear and decide such a question, even though such decision involve the construction of a paper executed by the decedent, and a determination as to whether the sums of money

which passed from the decedent were absolute gifts. In the case of Crow vs. Hubbard, 62 Md. 565, the Court of Appeals decided that this Court had jurisdiction in a dispute between an executrix and a distributee where the title to a watch was involved.

We are further confirmed in our opinion that we have jurisdiction in this case by the language of Section 231 of Article 93 of the Code. It is as follows: "The Orphans' Court shall have full power, authority and jurisdiction to examine, hear and decree upon all accounts, claims and demands existing between wards and their guardians, and between legatees or persons entitled to any distributive share of an intestate's estate and executors and administrators, and may enforce obedience to, and execution of, their decrees in the same ample manner as the Courts of Equity in this State."

After a careful reading of the case of Daugherty vs. Daugherty, decided in 1896, and reported in 82 Md. 229, and which has been cited as declaring the contrary of our assertion of jurisdiction in this case, we are of the opinion that it does not apply. That case was tried below and above upon a petition and answer under oath. No testimony was taken or evidence offered by either party, and the allegations of the answer were taken to be true. The answer denied that there was any estate. The question on the pleadings was as to the validity of transfers by deed of personal property made by an intestate during his lifetime. It necessarily involved his mental capacity and questions of proof and construction, with which clearly only a Court of equity could deal. The Court of Appeals rightly so decided without referring to the sections of the Code and the cases we have cited. In this case we are dealing with assets of an estate which have been accounted for under oath by co-administrators appointed by this Court, and admitted by them under oath to be held by them, "pending controversy as to ownership." We have shown that the only ground upon which "ownership" is asserted by one of the co-administrators is insufficient. We have no doubt of our jurisdiction to administer justice in the premises.

It follows from the aforegoing that the prayer of the petitioners must be granted, and that the administrators of the. estate of Matilda W. Gies will

be required to at once state a second account and distribute the balance of the estate to the distributees legally entitled thereto. If the estate is indebted, as is alleged, to Mrs. Warren, she must prove her claim as the Code requires. (Article 93, Section 96.)

We believe that Mr. and Mrs. Warren have erred through ignorance of the law and the rights of others, and we will, therefore, order that no interest be charged on the balance in their hands, and that the costs of this proceeding be paid out of the estate of Matilda W. Gies. We will sign an appropriate order.