FARMERS TRUST COMPANY OF NEWARK, a corporation of the State of Delaware,

*vs.*

CHARLES B. EVANS, Executor under the Last Will and Testament of Samuel Rambo, deceased, and MARY E. TROUT.

*New Castle, June 9, 1932.*

*Edmund S. Hellings,* for complainant.

*Ivan Culbertson,* for Charles B. Evans, executor of Samuel Rambo, deceased.

*William S. Potter,* for Mary E. Trout.

THE CHANCELLOR: The certificate of deposit in Rambo's name is dated July 16, 1930. For four years and five months preceding his death on August 8, 1930, he boarded with Mrs. Laura E. Harlan in Newark, Delaware. He had heart trouble. He stated to Mrs. Harlan, on one occasion, that his doctor had told him that he could not live

because he had a bad heart. When he made this statement, whether soon before his death or early in the period of his four years and five months stay with Mrs. Harlan, or even before that time, does not appear. Who the doctor was that was attending him when he was told he could not live, Mrs. Harlan does not know.

Rambo was subject to attacks of illness due to his heart. He was periodically sick for a long time before his death. He became sick again about August 1, 1930, because of his heart and the heat. Dr. West attended him. The doctor was not called as a witness. It appears that Rambo was not confined to his bed during all the time of his illness. On August 7 he was "up and down." On that day Mrs. Harlan and the defendant, Mary E. Trout, a second cousin of Rambo, were in the room with him. He asked Mrs. Harlan to get his pocket-book from his trousers, though he was able himself to get up. He wanted to pay for some laundry. Mrs. Harlan secured for him the pocket-book. He took out a dollar and handed it to her to pay for the laundry. He emptied the contents of the pocket-book on the bed and then replaced them. Mrs. Harlan testified that she saw a yellow paper which, as I understand her testimony, she cannot identify as the certificate of deposit; but which in a general way resembled it.

After replacing the contents, Mrs. Harlan says that Rambo gave the pocket-book to the defendant, Mary E. Trout, telling her "to keep it because he wanted her to be paid for her kindness." He made no mention of what was in the purse and at no time during that day or any other, so far as the testimony shows, did he ever refer to the certificate of deposit.

Mrs. Trout took the pocket-book, opened it after Rambo's death on the next day, and found the certificate of deposit therein.

The four thousand dollar certificate of deposit constitutes Rambo's entire estate. He left a will, dated October 10, 1918, in which no mention is made of Mrs. Trout as a beneficiary.

The certificate of deposit was transferable only upon endorsement. It was not, however, endorsed.

The foregoing are the facts as shown by the evidence. The defendant, Mrs. Trout, contends that they show a valid gift to her *causa mortis* of the certificate. The defendant executor contends *contra* and claims the certificate as an asset of the estate.

In *Robson v. Robson's Adm'r.*, 3 *Del. Ch.* 51, Chancellor Bates took occasion to consider at some length the nature of gifts *causa mortis*, somewhat of their origin, and the general rules which are to be applied in testing their creation. He held in that case that gifts *causa mortis* are testamentary in character and are indulged by the law as exempt from the usual formalities required for the manifestation of a testamentary intent solely because of the exceptional circumstances in which, at the moment of their bestowal, the donor finds himself. Mere casual reflection is enough to convince one that the recognition by the law of such gifts affords to those who are around a person *in periculo* an opportunity to appropriate his personal property to their own use under a false claim of a gift and facilitates the means of perpetrating frauds upon his estate. This is the reason for the strict and exacting proof which courts have demanded of alleged donees of gifts *causa mortis*, before their claims are accepted. So full of danger to the just rights of legatees or distributees is the doctrine of gifts *causa mortis*, that Chancellor Bates in the case cited *supra* joined apparently in the regret expressed by Lord Hardwicke in *Ward v. Turner*, 2 *Ves., Sr.* 437, and Lord Eldon in *Duffield v. Elwell*, 1 *Bligh*. 533, that such gifts had not been wholly abolished.

The instant case supplies us with a set of circumstances admirably adapted to illustrate the great possibilities of fraudulent abuse of the doctrine which always inhere in it. Here was a man who had made a will disposing of all of his estate, which consisted at the time of his decease of four thousand dollars deposited in bank, evidenced by a cer-

tificate of deposit, payable only when endorsed by him. The day before he died he was up and down. He was not helpless. He could write as is shown by the fact that he signed the will which is in evidence. He could very easily have endorsed the certificate and thus have himself supplied the evidence of his wish to make a gift of the money to the claimed donee of it. He did not do this. The unendorsed certificate was in the room with him, and after his death which shortly followed, the claim is made by one of the persons who were in the room that the deceased had made a gift to her of the certificate and therefore of the money. If manual delivery of the certificate was sufficient, without endorsement as is stated in *Basket v. Hassell*, 107 *U. S.* 602, 2 *S. Ct.* 415, 27 *L. Ed.* 500, and as is expressly held in *Callahan v. Forest*, (*Sup.*) 118 *N. Y. S.* 541, and in *Mellor v. Bank of Willows*, 173 *Cal.* 454, 160 *P.* 567, then it is apparent that an easy way of securing the four thousand dollars was open. All that needed to be done was for the alleged donee to take the receptacle in which the deceased carried the certificate and set up a claim that he whose lips were sealed, and who had not left the persuasive testimony of an endorsement, had given it to the alleged donee. To be sure perjury would have to come to the aid of the claim. But human experience teaches us that perjury is not so repulsive to some people as the desire for gain is seductive.

In what has just been said I wish to be expressly understood as not meaning to impute perjury to the one witness who testified to the gift. I have used the circumstances of the present case solely to illustrate the possibilities of fraud which are always latent in cases of gifts *causa mortis*.

So manifest are these possibilities that courts have adopted the rule of strictest proof when called upon to say whether or not a gift *causa mortis* was made. As stated in 28 *C. J.* 705, with citation of authorities, the evidence must be "cogent, full and conclusive, clear and unmistak-

able, definite, clear, and convincing, * * * strong and satisfactory, of the clearest and most satisfactory character, etc."

In *Robson v. Robson's Adm'r., supra,* Chancellor Bates said, that the validity of a gift *causa mortis* is subject to these conditions. "1st. It must be made 'in peril of death.' 2d. To guard against fraud and supply an equivalent to the written evidence of intention, an actual delivery of the property is required. 3d. Upon the recovery of the donor and his consequent ability to comply with the statute, the dispensation from its requirements ceases and the gift *causa mortis* though valid when made becomes of no further force. No express condition to this effect is necessary." He further added that like legacies, gifts *causa mortis* are ambulatory and are revocable at pleasure.

In the view I take of the case now before the court, it is sufficient for its disposition to consider only the first condition noted by Chancellor Bates as incident to gifts *causa mortis,* viz., that they must be made "in peril of death." What this phrase, which is so often met with in the cases, means and the precise condition of disability indicated by it, is a question which the Chancellor said he had labored to obtain from the authorities. He confessed his inability to derive from the text-books and decisions any settled conclusion upon it. Whether the donor in order to be "in peril of death" must be in the apprehension of death as presently imminent or, as it is said, *in extremis,* or whether it is sufficient if death be contemplated as the probable result of sickness, a result likely or even certainly to occur but after an indefinite interval it may be of weeks or months, as in the case of chronic diseases generally, is a question upon which he found the texts and cases so indefinite as to make impossible a settled expression of opinion.

Finding it unnecessary under the facts of the case then before him to say whether the view for which he expressed an inclination, viz., that the gift must in order to be valid be made by the donor when *in extremis,* he left the question

as to that view open, and proceeded to examine the facts under the assumption that the more liberal definition of the term, "in peril of death," was permissible.

In the present cause, though the donor as the event showed was in his last illness, yet the evidence fails to show that he either knew or apprehended the fact. He gave utterance to no expressions tending to indicate a belief that he was then *in extremis* and the character of the attack from which he suffered was such as he had before experienced periodically and from which he had periodically recovered. I am unable to persuade myself that at the time of the alleged gift he contemplated death as the probable result of his present illness. He of course may have. But, if he did, we must resort to speculation to believe it. The fact is not made out by clear and convincing proof.

The sole piece of evidence to which the donee can point as indicating an apprehension in the mind of the donor of death as a probable result of his existing illness, is the fact stated by Mrs. Harlan that on one occasion he told her that his doctor had told him that because he had a bad heart, he could not live. This sort of expression is consistent with the idea that the patient would, when he died, pass away as a result of heart disease. It does not necessarily mean that death is imminent or lurking in the near future. It is not inconsistent with the thought that at some indefinite time it will come and that when it does it will be due to a bad heart. Who the doctor was that made the statement to him, Mrs. Harlan does not know. It would seem that if he was a doctor who had attended the donor while he lived in Mrs. Harlan's home, she would have had some knowledge of the doctor's identity. The donor had lived in her home for over four years. It is not unreasonable to suppose, then, that the doctor who advised the donor of his bad heart and its ultimately fatal consequences, did so more than four years prior to his death. Certainly, it seems to me, that a belief entertained at a moment as long possibly as four years before death that a bad heart would re-

sult eventually in death, is not enough to show that at the time when death was actually to seize the victim he was under the present apprehension that his current illness would prove to be his last; especially when it is remembered that examples are numerous of cases where the victims of heart disease are known to live for a period of years which are punctuated by recurring attacks and recoveries.

The doctor who attended the deceased at the time of his death was Dr. West, who resides and practices at Newark, Delaware, where the deceased lived. Dr. West was not called as a witness. It is reasonable to assume that Dr. West who was in immediate attendance upon the deceased could throw no light upon the state of mind of his patient with respect to his contemplation of death as a likely result of his then present illness. The failure to call Dr. West and to inquire of him concerning the state of the deceased's health and its likelihood of indicating to the victim the approach of death, and the expressions, if any, made by the doctor to the deceased or by the latter to the former, which might throw light on the apprehensions of the deceased, suggests to my mind that there was nothing in the last illness of the defendant which was calculated to make him believe that he was undergoing an attack in any wise different from those he had theretofore undergone and from which he had periodically recovered.

The statement which the deceased is reported to have made when he is said to have given the pocket-book to Mrs. Trout was that he wanted her to keep it because he wanted her to be paid for her kindness. So Mrs. Harlan testifies. The statement contains no inherent evidence, as is often if not usually found in cases of this sort, which indicates that the alleged gift is made in contemplation of death. It is entirely consistent with a gift *inter vivos,* a sort of gift which the alleged donee makes no pretense of claiming as having been made.

The result of the evidence, putting it as strongly for the alleged donee as is possible, shows this to be the state

of the case: A man has heart trouble, apparently chronic; at some time or other, possibly as long as over four years before his death, if not longer, he said that he was told by some doctor that he could not live because of a bad heart; he had periodic heart attacks from which he survived, temporarily recovered; another attack came upon him, and during its progress he was up and down, being so on the day before he died; on that day he gave his pocket-book which contained an unendorsed certificate of deposit to his second cousin, telling her to keep it as he wanted her to be paid for her kindness; no information is supplied to us from the doctor in attendance upon him concerning the severity of the attack from which some evidence might possibly at least be inferred as to whether the illness was of such intensity as necessarily to indicate that the victim must have been apprehensive of death's approach; and on the day after the alleged gift, he died.

I am unable to persuade myself that such a case shows with sufficient clearness that the alleged gift was made in contemplation of death as the phrase, even under a liberal interpretation of it, is understood in its application to gifts *causa mortis*. The fact that death did ensue on the day after the alleged gift was made, does not demonstrate that the victim had it in contemplation when the gift was made. It is fallacious to argue that because an event shortly occurs therefore it must have been apprehended or held in contemplation. Of course if the circumstances of the illness, its intensity and ominously threatening features, at the time reasonably indicated in and of themselves that they were but a prelude to death, the case might be different, though this I am not called upon to decide; for there is nothing in the evidence which indicates that such was the case. So far as we know, the attack may have been even less severe than others which the donor had suffered and successfully withstood. Granting that the donor had been told possibly several years before he died, and then believed, that at some time in the future his bad heart would cause

his death, it would be going far to conclude from that circumstance that he was under the apprehension that a particular attack, occurring long after, marked the time when the predicted end was about to arrive. I said "occurring long after." The evidence permits, though it does not in positive terms justify, the expression. The burden is on the donee to negative all adverse inferences which militate against her claim, and this she has not done with respect to the inference that the interval between the time when the donee was advised that he could not live because of a bad heart and the date of his death, was a long one.

I conclude then that it is not satisfactorily demonstrated that the alleged gift when made was made in contemplation of death.

In view of this finding it becomes unnecessary to pass upon two other questions which were debated at the argument and on the briefs, which are: First, does it satisfactorily appear that the certificate of deposit was known by the donor to be in the pocket-book at the time of the alleged delivery; and, second, if so, was an endorsement of the certificate necessary for its valid delivery?

Decree declaring the fund called for by the certificate to be the property of the executor of Samuel Rambo.

NOTE.—From the decree entered in accordance with the foregoing opinion, Mary E. Trout took an appeal. The decree of the Chancellor was affirmed by the Supreme Court, and its opinion will be reported in 19 *Delaware Chancery Reports*. See also 168 *A.* 208.