MARY E. TROUT,

Defendant Below, Appellant,

*vs.*

FARMERS TRUST COMPANY OF NEWARK, a corporation of
the State of Delaware, Complainant Below, and
CHARLES B. EVANS, Executor under the last Will and
Testament of Samuel M. Rambo, Deceased,

Defendant Below, Appellees.

*Supreme Court, on Appeal, April* 12, 1933.

Pennewill, C. J., and Rice, Harrington, Richards, and Rodney, JJ., sitting.

*William S. Potter* (*H. Edgar Sherts* and *William B. Arnold*, both of Lancaster, Pa., of counsel), for appellant.

*Edmund S. Hellings* and *Ivan Culbertson* (*W. Hensel Brown*, of Lancaster, Pa., of counsel), for appellees.

Appeal from the Court of Chancery.

STATEMENT OF THE CASE. Appeal from a decision of the Chancellor on a bill of interpleader, filed by Farmers Trust Company of Newark, a corporation of the State of Delaware v. Charles B. Evans, Executor under the last Will and Testament of Samuel Rambo, deceased, and Mary E. Trout, in which it was held that the gift of certain personal property by Samuel M. Rambo, a short time prior to his death to Mary E. Trout, was not valid as a gift *causa mortis*. See 18 *Del. Ch.* 350, 162 *A.* 41, for report of the case below.

Samuel M. Rambo died on August 8, 1930, and was seventy-six years of age. He was a bachelor and for the last four years of his life had lived at the boarding house of Mrs. Laura E. Harlan, in Newark, Delaware.

It appeared from the testimony taken before the Chancellor that he had been subject to heart attacks for some

time before his death and had been told by a physician that he could not live. On account of these attacks, he was confined to his bed at times after which he would be up and around but was not able to do any work. In the latter part of July, 1930, he had a heart attack and on the 24th day of July sent word to Mary E. Trout, the appellant, who was his cousin, that he was sick and requested her to come to see him. In compliance with this request the appellant went from her home in Lancaster, Pennsylvania, to Newark and spent the afternoon with Mr. Rambo. She again came to see him on July 29, which was the following Tuesday. He again sent for her on Saturday, August 1, but she was unable to go until Tuesday, August 5. At nine o'clock on the evening of August 6, Mr. Rambo requested Mrs. Harlan to call Miss Trout and ask her to come at once because he was seriously ill. The appellant started immediately, arriving at his bedside at eleven o'clock that evening and remained with him until his death on the morning of August 8. About three o'clock on the afternoon of August 7, Mr. Rambo requested Mrs. Harlan to hand him his pocket book in order that he might pay for some laundry. He then requested Mrs. Harlan to give to Mary, meaning this appellant, the change from the dollar which he had used for that purpose. While he still had his pocket book in his hands, he took out the contents, examined them and placed them on the bed beside him. He then put them back into the pocket book and gave it to Miss Trout, the appellant, telling her to keep it because he wanted her to be paid for her kindness to him. The appellant did as requested and after Mr. Rambo's death, upon opening the pocket book found therein, *inter alia,* a certificate of deposit for the sum of Four Thousand Dollars ($4000.00) issued by the Farmers Trust Company of Newark to Samuel M. Rambo, being No. 2031.

Samuel M. Rambo left a will dated the tenth day of October, A. D. 1918, in which he named Charles B. Evans,

one of the appellees, executor, and said will was duly approved and allowed before the Register of Wills in and for New Castle County, Delaware. In and by said will, he provided, *inter alia,* as follows:

"Item 5. All the rest, residue and remainder of my estate, real, personal and mixed wheresoever situate, to which I shall in any manner be entitled, I do give devise and bequeath unto my Cousin, Lucy A. Mowrey of Paradise, Lancaster County and State of Pennsylvania, and to her heirs and assigns forever."

Charles B. Evans, executor as aforesaid, claims that the said sum of Four Thousand Dollars ($4000.00) on deposit in the Farmers Trust Company of Newark, to the credit of Samuel M. Rambo, and represented by certificate of deposit No. 2031 is a part of the estate of the said Samuel M. Rambo, and that he is now entitled to said sum as the executor of the said Samuel M. Rambo.

The bill of interpleader filed by Farmers Trust Company of Newark by which this matter originated in the Court of Chancery, prayed that the said Charles B. Evans, Executor of Samuel M. Rambo, and the said Mary E. Trout be decreed to interplead, in order that the Chancellor might determine their respective rights and ascertain to which of them the said sum of Four Thousand Dollars ($4000.00), represented by certificate of deposit No. 2031, belonged and ought to be paid.

Eleven assignments of error were filed by the appellant, but there are only two which we think it necessary to consider and they are the seventh and eleventh which provide as follows:

"Seventh. That the Court erred in not finding and decreeing that the gift from Samuel Rambo to Mary E. Trout of the fund represented by the certificate of deposit was a valid and binding gift *causa mortis.*

"Eleventh. That the Court erred in not finding and holding that the gift of the certificate of deposit from Samuel Rambo to Mary E. Trout, the Appellant, was a valid gift in *inter vivos.*"

RICHARDS, Judge, delivering the opinion of the Court:

The question raised by the eleventh assignment of error, namely, that the gift of the certificate of deposit from Samuel Rambo to Mary E. Trout, the appellant, was a valid gift *inter vivos*, is being raised in this proceeding for the first time in this court. Throughout the hearing before the Chancellor, the appellant took the position that the gift of the certificate of deposit to her by Samuel M. Rambo was a gift *causa mortis* and the entire hearing before the Chancellor proceeded upon that theory. In fact, the Chancellor, himself, in the course of his opinion makes the following comment thereto:

"It is entirely consistent with a gift *inter vivos*, a sort of gift which the alleged donee makes no pretense of claiming as having been made."

Therefore, can this question which was not argued before the Chancellor or passed upon by him, be raised for the first time in this court on an appeal from the decision of the Chancellor? We find it to be the generally accepted rule that questions of whatever nature, not raised and concerning which the proper course for review was not taken in the trial court, will not be considered by the appellate court. While it is true that there are some exceptions to this rule, the most noticeable of which are those of a jurisdictional nature, we find no exceptions which cover questions similar to the one raised in this case. Some jurisdictions take the position that the appellate court is not necessarily restricted to the theory on which the lower court proceeded but they hold that it can only pass upon such errors as are apparent from the record, and that its judgment must be based upon grounds which were properly before the trial court. *Virtue v. Creamery Package Mfg. Co.*, 227 *U. S.* 8, 33 *S. Ct.* 202, 57 *L. Ed.* 393; *Thomas v. Taylor*, 224 *U. S.* 73, 32 *S. Ct.* 403, 56 *L. Ed.* 673; *Badger v. Ranlett*, 106 *U. S.* 255, 1 *S. Ct.* 346, 350, 27 *L. Ed.* 194;

*Town of Farmington v. Riley,* 88 *Conn.* 51, 89 *A.* 900; *Downard v. Hadley,* 116 *Ind.* 131, 18 *N. E.* 457; *Frey v. Iver Johnson Sporting Goods Co.,* 212 *Mass.* 213, 98 *N. E.* 682; *Patterson v. Buchanan,* 92 *Md.* 334, 48 *A.* 158; *Schmoll v. Lucht,* 106 *Minn.* 188, 118 *N. W.* 555; *Andrews v. Osborn,* 159 *Mich.* 77, 123 *N. W.* 599; *Hendon v. North Carolina R. Co.,* 127 *N. C.* 110, 37 *S. E.* 155; *Cook v. American E. C. & Schultze Gunpowder Co.,* 70 *N. J. Law,* 65, 56 *A.* 114; *Walls v. Campbell,* 125 *Pa.* 346, 17 *A.* 422.

*Section* 12 of *Article* 4 of the *Constitution* of this State, in defining the jurisdiction of the Supreme Court of this State at *Subsection* 4, confers upon it the following powers:

"To receive appeals from the Court of Chancery, and to determine finally all matters of appeals in the interlocutory or final decrees and to proceedings in Chancery."

It seems clear from this provision of the Constitution that before this court can pass upon any question raised on an appeal from the Court of Chancery, it must appear from the record which is sent up to this court from the Court of Chancery that said question was raised at some stage of the proceedings in the Court of Chancery. In the appellant's answer filed in the Court of Chancery to the bill of interpleader, the ground upon which she claims to be entitled to the amount represented by the certificate of deposit is not set forth and it cannot be ascertained therefrom whether she claimed it as a gift *causa mortis* or a gift *inter vivos.* During the hearing before the Chancellor, her entire efforts were devoted to establishing her claim to the certificate as a gift *causa mortis.* The testimony seemed to be based on that theory and the objections made from time to time to questions on behalf of the appellant brought out the fact that the appellant was attempting to establish such a gift. Therefore, the only question for the Chancellor's determination was whether the testimony before him was sufficiently strong to support the appellant's claim

to the certificate as a gift *causa mortis,* and that was the only question passed upon by him in his final decree. Nowhere in the proceedings in the Court of Chancery, did this appellant claim to establish her right to the certificate as a gift *inter vivos* and there was no reason why the Chancellor should refer to it in any way or adjudicate it in his decree. This being the state of the record, the question of whether the appellant is entitled to said certificate as a gift *inter vivos* is not now properly before this court as a matter of appeal in the interlocutory or final decrees and proceedings in Chancery.

The doctrine of *donatio causa mortis* goes back to a very early period. It was brought to England as a part of the Roman or civil law, and seems to have been recognized by the Greeks before it was known to the Romans. This country adopted it as a part of the common law of England, and such gifts are now generally recognized here. Gifts *causa mortis* have some of the properties of gifts *inter vivos,* and they also possess some of the characteristics of legacies, but they more closely resemble testamentary dispositions as they permit a person to dispose of personal property, to take effect after death, without a will. Blackstone gives the following definition: "When a person in his last sickness, apprehending his dissolution near, delivers or causes to be delivered to another the possession of any personal goods, to keep in case of his decease." 2 *Sharswood's Blackstone* 514. The authorities all agree that there are certain necessary requisites for the validity of such a gift. The first and probably the most important of these is that it must be made in "peril of death." Another is, in order that all possible safeguards may be taken to prevent fraud and to supply something in lieu of the donor's intention as expressed by an instrument of writing, such as a will, an actual delivery of the property must be made. Still a third is, the donor must actually die in order for the gift to become effective; for if he should recover it is readily

seen that he would be able to dispose of the property by will or any other means.

Ward v. Turner, 2 Ves. Sr. 437; Duffield v. Elwees, 1 Bligh, 533; Robson v. Robson's Adm'r., 3 Del. Ch. 51; Kilby v. Godwin, 2 Del. Ch. 61; Barnes v. Barnes, 174 Ala. 166, 56 So. 958; Basket v. Hassell, 107 U. S. 602, 2 S. Ct. 415, 27 L. Ed. 500; Barnum v. Reed, 136 Ill. 388, 26 N. E. 572; Moore v. Shifflett, 187 Ky. 7, 216 S. W. 614; Stevens v. Provident Inst. for Savings, 226 Mass. 138, 115 N. E. 404; Chase v. Redding, 13 Gray (Mass.) 418; Varley v. Sims, 100 Minn. 331, 111 N. W. 269, 8 L. R. A. (N. S.) 828, 117 Am. St. Rep. 694, 10 Ann. Cas. 473; Clayton v. Pierson, 55 W. Va. 167, 46 S. E. 935.

What the terms "peril of death" mean does not seem to have been definitely determined by the decisions. In the early case of Hedges v. Hedges, Pr. Ch. 269, Lord Chancellor Cooper held that in order to constitute a valid gift causa mortis the donor must be in extremis, or surprised with sickness without having an opportunity to make a will. The later decisions both in England and this country have not been so clear on the question and have left it in an uncertain state. In the case of Ward v. Turner, 2 Ves. Sr. 439, Lord Hardwiske brings out the fact, that the entire system of gifts causa mortis as recognized under the civil law, was not adopted in England, but only that class of them in which the gift is made in contemplation of death as a present danger. Chancellor Bates gave a very good explanation of the present state of the law in the case of Robson v. Robson's Adm'r., 3 Del. Ch. 51, when he said: "the truth is that the natural desire to fulfill the wishes of deceased persons, especially in favor of what are often meritorious claims, has kept the rule always under a strain, which has caused the present uncertainty." Chancellor Bates considered the matter at great length and was strongly inclined to take the view, that in order to sustain a gift causa mortis, it must appear that the donor, when

making the same, was *in extremis*. But on account of the unsettled condition of the law, he left it as an open question.

Chancellor Wolcott practically took the same view in the case now before this court, but after carefully reviewing the testimony, arrived at the conclusion that at the time the alleged gift was made, the donor was not in contemplation of death as the probable result of his then illness. Was this conclusion of the Chancellor correct? In order to sustain a gift *causa mortis,* all of the facts which are necessarily required to constitute a gift of that character should be clearly and satisfactorily proven. The evidence detailing such facts should not only be strong and convincing but of the most satisfactory nature. The reason for demanding such proof is, in order that fraud, which the law is so zealous to guard against, cannot be perpetrated against those who are entitled to the estate of the deceased.

*Basket v. Hassell,* 107 *U. S.* 602, 2 *S. Ct.* 415, 27 *L. Ed.* 500; *Barnum v. Reed,* 136 *Ill.* 388, 26 *N. E.* 572; *Whalen v. Milholland,* 89 *Md.* 199, 43 *A.* 45, 44 *L. R. A.* 208; *Scollard v. Brooks,* 170 *Mass.* 445, 49 *N. E.* 741; *Kimball v. Green,* 148 *Mich.* 298, 111 *N. W.* 761; *Snyder v. Harris,* 61 *N. J. Eq.* 480, 48 *A.* 329; *Ridden v. Thrall,* 125 *N. Y.* 572; 26 *N. E.* 627, 11 *L. R. A.* 684, 21 *Am. St. Rep.* 758; *Gano v. Fisk,* 43 *Ohio St.* 462, 3 *N. E.* 532, 54 *Am. Rep.* 819; *Wells v. Tucker,* 3 *Bin.* (*Pa.*) 366.

The evidence discloses that Samuel M. Rambo had been told by a physician that he had a bad heart; just when he was given this information was not brought out, but it appeared that he had not been able to do any work for four years and five months before his death. During this period he was confined to the bed at times but most of the time he was up and able to care for himself. Miss Trout, his cousin, and the person to whom his alleged gift was made, was notified on July 24, 1930, that he was sick and requested her to come to see him; she went to see him again on the following Tuesday and was called to come again on

the following Saturday but did not go until Saturday, August 5; she was called at nine o'clock in the evening on August 6 and again requested to come to see him and upon arriving there at eleven o'clock found him in bed and very weak; on the afternoon of August 7, Mr. Rambo requested his pocket book to pay for some laundry, and while sitting on the side of the bed after taking the contents from the pocket book, including a paper which it is claimed was the certificate of deposit in question, placed them back into the pocket book and gave it to Miss Trout telling her to keep it because he wanted her to be paid for her kindness to him. He died on the following day, August 8. The record does not disclose that he spoke of his condition at any of the times Miss Trout visited him or said anything to indicate that he thought he was going to die. The only time she found him in bed was when she arrived at eleven o'clock on the evening of August 6. He had been up that day and was up a part of the day on August 7, the day upon which the alleged gift was made, or, as Mrs. Harlan testified, was up and down.

He had been periodically sick during the entire four years and five months that he had boarded with Mrs. Harlan, but never had he, at any time, indicated that he thought he was going to die as a result of his then sickness. So far as we are able to gather from the record, the only time he ever spoke of dying was when he told Mrs. Harlan that he had been told by a doctor that he had a bad heart and could not live long. At the time the gift was made he was not feeling as well as usual, but there was nothing to indicate that he was worse than he had been many times before. He was sitting on the side of the bed at the time waiting for a clean shirt to be brought him, but said nothing concerning his condition from which it might be inferred that he expected to die soon or that he did not expect to be as well as usual within a short time. In other words, there was nothing which pointed to a belief on the part of the deceased

that he was in his last sickness or apprehended that his dissolution was near. This being the case, we are of the opinion that the Chancellor was right in his conclusion and that his finding should be affirmed.

NOTE.—Judge Rice sat in the argument of this case, but died before the opinion was filed.